554 So.2d 1237 (1989)
William WINSTEAD
v.
ED'S LIVE CATFISH & SEAFOOD, INC., Edward D. Gilliam and Jean Arnold Gilliam, d/b/a Ed's Live Catfish & Seafood, Wilson's Oysters, Inc., the Louisiana Department of Health & Human Resources, the Louisiana Department of Wildlife and Fisheries, Paul Fitch, Raymond Lovell, Nelson Lirette, Charles Lirette, Morris Scott, James Daisy, C.J. Scott, Alex Punch, Curtis Verret, Jr., Lloyd Gates, Earl Brown, Leray Billiot, Roosevelt Falgout, Junios Verret, Roy Billiot, Paul Dion, Donald Dehart, Wilson Voisin, Sr.
No. CA 88 1589.
Court of Appeal of Louisiana, First Circuit.
November 14, 1989.
Rehearing Denied December 15, 1989.
Writ Denied March 9, 1990.
*1238 T. Mack Brabham, McComb, Miss., for plaintiff-appellee William Winstead.
Jack Harang, Metairie, Richard Brazan, Baton Rouge, La., for defendant-appellee Louisiana Dept. of Wildlife and Fisheries.
Craig Nelson, New Orleans, for defendant-appellant Louisiana Department of Health and Human Resources.
Carey Gugliemo, Baton Rouge, for defendant-appellee Ed's Live Catfish and Seafood, Edward Gilliam and Jean Arnold Gilliam, Aetna Cas. & Sur. Co.
Before LOTTINGER, CRAIN and LeBLANC, JJ.
LOTTINGER, Judge.
This is an action ex delicto brought by William Winstead against numerous defendants arising from Mr. Winstead's consumption of approximately two dozen raw oysters and his subsequent illness. Due to various settlements and dismissals, the Louisiana Department of Health and Human Resources (DHHR) was the only remaining defendant at the trial of this matter.
The sole issue at trial was whether the DHHR had a duty to warn the plaintiff that vibrio vulnificus, a naturally occurring bacteria normally present in oysters, could cause serious illness or death in persons with certain underlying conditions if they consume raw oysters. The trial court held the DHHR liable for failing to warn the *1239 plaintiff of this danger inherent in eating raw oysters. DHHR appeals from this judgment assigning seven specifications of error.

FACTS
On August 12, 1983, William Winstead, a thirty-five year old Texas resident visiting Mississippi, ate approximately two dozen raw oysters at a lounge in Magnolia, Mississippi. The oysters had been harvested in Louisiana coastal waters and purchased by the lounge owner from a Baton Rouge, Louisiana seafood dealer some seven to ten days prior to being ingested by the plaintiff.
Mr. Winstead became ill within eight hours after eating the oysters and his condition worsened such that he was gravely ill and near death when he was hospitalized four days later. He remained in the intensive care unit for approximately 10 days and spent a total of 30 days in the hospital. He has subsequently almost completely recovered and at present suffers only a mild restrictive defect in lung capacity as a result of his illness.
The illness that almost killed Mr. Winstead is known as septicemia and is caused when a toxin-producing bacteria invades the bloodstream. The bacteria which caused Mr. Winstead's septicemia is called vibrio vulnificus.
This bacteria is a naturally occurring, free living marine bacteria, and it is found in seawater of the appropriate salinity and temperature worldwide. It proliferates during the warmer months of the year and decreases in number during the cooler months. Oysters, since they constantly filter water, harbor vibrio vulnificus whenever it is present in the water in which they live. Only by eating raw oysters, or other raw or uncooked seafood, or by swallowing seawater, can the bacteria get into a person's gastro-intestinal tract and then into the bloodstream. Like most other bacteria, any vibrio vulnificus present would be killed by cooking the oyster or other seafood.
Vibrio vulnificus is an opportunistic bacteria. It generally does not harm persons with normal immune system responses. In a normal healthy person, acid in the stomach together with the liver and kidney prevent this bacteria from reaching the bloodstream. However, persons with a weakened immune system, i.e. those with liver disease, kidney disease, peptic ulcers, cancer, heavy drinkers (alcohol induced cirrhosis), those with chronic indigestion who take large doses of antacids, and those who take immuno-suppressive drugs (steroids, chemotherapy), are more succeptible than the average person to becoming infected with vibrio vulnificus if they eat raw oysters containing the bacteria.
Although vibrio vulnificus is found naturally in a substantial percentage of oysters (55% to 70%), it is not present in all oysters. The concentration of the bacteria naturally occurring in oysters varies greatly depending on water temperature and salinity. Chilling the oysters to near freezing substantially reduces the concentration of the bacteria, while storing them at environmental temperatures can substantially increase the concentration. Some strains of vibrio vulnificus are more virulent than others, and some do not produce any toxins at all.
The chances of developing septicemia from eating raw oysters depends on the number of oysters consumed, the concentration of vibrio vulnificus in those oysters, the virulence of the strain of bacteria present, and the condition or strength of the body's immune system. However, once the bacteria gets into a person's bloodstream and septicemia develops, the mortality rate is 50% to 70%.
The plaintiff, William Winstead, had a liver disfunction at the time he ate the oysters at issue although he did not know it. He had also eaten raw oysters several times before this incident and had never had any problems.
In 1983, the State of Louisiana, and the DHHR specifically, knew about vibrio vulnificus and the risks it posed. The DHHR knew the basic at risk groups and that although relatively few people develop septicemia from this bacteria, among those who did there was a high mortality rate. *1240 Before August, 1983, there had been 14 cases of septicemia caused by vibrio vulnificus diagnosed in Louisiana; and of those, ten were fatal.
In August of 1982, the DHHR published the Monthly Morbidity Report and sent a copy to every physician in Louisiana, the Center for Disease Control (CDC) in Atlanta, Georgia, and the health department of several neighboring states, including Mississippi. This report described the bacteria vibrio vulnificus, the effect it has on humans, the underlying risk factors and risk groups, the primary method of infection, the high mortality rate associated with the infection, how to identify the septicemic condition and the appropriate medical response. It advised that physicians should warn their patients with any of the underlying risk factors not to eat raw seafood.
The trial court held that the State of Louisiana, through the DHHR, had a duty to warn the plaintiff of the risk of contracting vibrio vulnificus induced septicemia from eating raw oysters, and that the state had breached its duty. The DHHR appeals this ruling and assigns the following specifications of error:
I. The trial court erred in issuing a second judgment reversing its ruling on the retroactivity of Revised Statute 9:2798.1, two months post trial.
II. It was error for the trial court to create a duty on the DHHR to warn when no such duty exists in Louisiana Statutory or case law.
III. It was error for the trial court to conclude any act or omission of DHHR was a cause in fact of plaintiff's injury.
IV. It was error for the trial court to conclude the DHHR did not warn the public about the vibrio vulnificus bacteria and its relationship to raw oyster consumption.
V. It was error for the trial court to deny DHHR's motion for a jury trial on the issue of co-defendant's negligence and then fail to decide if any co-defendant was guilty of negligence which contributed to plaintiff's injuries.
VI. It was error to allow Dr. Jeffrey Johnston to give any opinions regarding the warning issue in this case.
VII. The trial court erred in assessing damages for plaintiff in the amount of $295,000.

ASSIGNMENT OF ERROR NO. I
Prior to the trial of this matter, the DHHR filed a motion for summary judgment. One of the several grounds asserted by the DHHR as a basis for summary judgment in its favor was the argument that La.R.S. 9:2798.1, which was enacted in 1985, applies retroactively and precludes a finding of liability against it.
La.R.S. 9:2798.1 provides:
"A. As used in this Section, `public entity' means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
"B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
"C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
"D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters *1241 of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana."
The DHHR contends that the trial court first held this statute to be applicable, and then, after the trial, amended its ruling to hold that the statute was not applicable, and that this was a substantive amendment to a final judgment in contravention of La.Code Civ.P. art. 1951.
The trial court issued its first ruling on the motion for summary judgment from the bench prior to trial, stating: "I think the motion is good on all of the areas except the duty to warn. I would like to try this case on the question of whether there was a duty to warn issue." The trial judge, in an attempt to clarify his ruling for counsel stated "[t]hat was my intent, to grant a summary judgment to all issues except the duty to warn."
It is not entirely clear to us that the trial court even ruled on the retroactivity of La.R.S. 9:2798.1 in the first judgment. In any event, the issue of retroactivity is not appropriate for summary judgment pursuant to La.Code Civ.P. art. 966. A summary judgment pursuant to La.Code Civ.P. art. 966 must grant or deny part or all of the relief prayed for by one of the parties. Stock v. City-Parish of East Baton Rouge, 525 So.2d 675 (La.App. 1st Cir. 1988). A ruling that this statute applies or does not apply retroactively does not grant any of the relief sought by either of the remaining parties in this case.
Nor is a ruling on the applicability of this statute a final judgment under La.C. C.P. 1841. Such a ruling does not determine the merits of the issue involved, but is only a preliminary matter and therefore interlocutory. La.Code Civ.P. art 1841. Thus, La.Code Civ.P. art. 1951 which governs the amendment of final judgments is not applicable.
However, we will treat this assignment of error as one disputing the correctness of the trial court's amended judgment ruling that La.R.S. 9:2798.1 is not to be applied retroactively.
The general principle of the non-retroactivity of laws is set forth in former[1] Article 8 of the Civil Code, which provided: "A law can prescribe only for the future; it can have no retrospective operation, nor can it impair the obligation of contracts." Likewise, La.R.S. 1:2 provides that no statute is retroactive unless it is expressly so stated.
According to the Louisiana Supreme Court's interpretation of civilian theory, however, the principle of non-retroactivity of existing legislation admits three exceptions: laws that suppress or lessen penalties, laws that are merely interpretive of existing legislation, and laws that the legislature has expressly or impliedly declared to be retroactive. Lott v. Haley, 370 So.2d 521, 523 (La.1979); Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331, 1338 (La.1978). One caveat to these exceptions is that a law will not be applied retroactively if doing so would unconstitutionally disturb vested rights. Lott.
The DHHR argues that La.R.S. 9:2798.1 is merely interpretive of the Public Duty Doctrine; see, Dufrene v. Guarino, 343 So.2d 1097 (La.App. 4th Cir.) writ denied 343 So.2d 1069 (La.1977), and should therefore be accorded retroactive effect. The plaintiff argues that to apply La.R.S. 9:2798.1 retroactively would divest him of a vested right.
The exception relating to interpretive laws has been explained by Professor Yiannopoulos as follows:
"The exception ... is justified on the ground that these laws do not establish new rules; they merely determine the meaning of existing laws and may thus be applied to facts occurring prior to their promulgation. In these circumstances, *1242 there is apparent rather than real retroactivity, because it is the original rather than the interpretive law that establishes rights and duties."
A. Yiannopoulos, Civil Law System, 68 (1977).
The Louisiana Supreme Court has recognized that interpretive legislation cannot properly be said to divest vested rights, because, under civilian theory, such legislation does not violate the principle of non-retroactivity of laws. Therefore, if a statute is interpretive of existing law, by definition it cannot divest one of a vested right.
In a civil law system such as Louisiana's, stare decisis, a common law notion, is not controlling. Judicial opinions, although invaluable interpretations of the law, are merely that; interpretations of the legislative will. The supreme expression of legislative will in Louisiana is of course the codes and statutes. In the area of delictual responsibility, Civil Code Article 2315, et seq., is the fountainhead from which all judicial and legislative interpretations flow.
Although the public duty doctrine has been severely criticized by the Louisiana Supreme Court, it has never been overruled. Stewart v. Schmieder, 386 So.2d 1351 (La.1980); Lott v. Landor, 452 So.2d 1266 (La.App. 1st Cir.), writ denied 458 So.2d 119, 125 (La.1984). This doctrine, like any other judicially created doctrine in a civil law jurisdiction is merely a judicial interpretation of the legislative will; in this case, La.Civ.Code art. 2315 et seq. La.R.S. 9:2798.1 is merely a legislative codification of the Public Duty Doctrine and other existing jurisprudence. See, La.R.S. 9:2798.1(D); McCloud v. Parish of Jefferson, 383 So.2d 477, 479 (La.App. 4th Cir.1980) (Lemmon, concurring) (No tort liability for failure of governmental body to perform discretionary act); Akins v. Jefferson Parish, 529 So.2d 27, 30 (La.App. 5th Cir.1988) (La. R.S. 9:2798.1 is a codification of the Public Duty Doctrine).
Insofar as La.R.S. 9:2798.1 describes a standard of conduct, it merely determines more precisely the meaning of certain kinds of fault by a certain class of defendants; i.e. acts or omissions not related to a legitimate governmental objective or criminal, fraudulent, etc. misconduct on the part of public officials or employees in carrying out their policy making or discretionary acts, who were originally responsible for the damage occasioned by such fault under Article 2315, et seq. Ardoin, supra, at 1339.
Therefore, we hold, in accord with the Second and Fifth circuits, that La.R.S. 9:2798.1 is interpretive of La.Civ.Code art. 2315, et seq. and a codification of the public duty doctrine, and that the legislature intended that it be applied retroactively. Thus, we conclude, it is applicable to the facts of this case. See, Sunlake Apartment Residents v. Tonti Development Corporation, 522 So.2d 1298 (La.App. 5th Cir.1988); Brown v. Red River Parish School Board, 488 So.2d 1132 (La.App. 2nd Cir.1986); La.R.S. 9:2798.1(D).
Applying La.R.S. 9:2798.1 to the facts of this case, we conclude that it bars recovery by the plaintiff against the DHHR. La. R.S. 9:2798.1, requires that in order to impose liability on the DHHR for discretionary acts, not only must there be a finding of liability under the standard duty/risk analysis, but there must also be a finding that either the conduct complained of was not reasonably related to the DHHR's legitimate governmental objectives or, it constituted criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
Assuming the existence of liability on the part of DHHR under a duty/risk analysis, La.R.S. 9:2798.1 would nevertheless bar recovery. The failure to warn complained of by the plaintiff constituted a failure to perform a discretionary act[2] within the *1243 lawful course and scope of the duties of the DHHR. Any warning would have been reasonably related to the DHHR's objectives, and the failure to warn did not constitute the gross misconduct contemplated by the statute.

ASSIGNMENTS OF ERROR NOS. 2, 3, AND 4
Not only are we of the opinion that the DHHR's acts or omission in this case do not satisfy the requirements for the imposition of liability set out in La.R.S. 9:2798.1, but the DHHR's conduct does not even satisfy the standard duty/risk analysis necessary to impose liability notwithstanding the applicability of La.R.S. 9:2798.1.
Under the duty/risk analysis adopted by the courts of this state, four inquiries must be answered in the affirmative before a plaintiff can recover based on a negligence theory.
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987); Stephens v. Pacific Employers Insurance Company, et al., 525 So.2d 288 (La.App. 1st Cir.), writ denied 532 So.2d 116 (La. 1988); Crochet v. Hospital Service District No. 1 of Terrebonne Parish, 476 So.2d 516 (La.App. 1st Cir.) writ denied 478 So.2d 1235 (La.1985); Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writ denied 427 So.2d 439, 429 So.2d 127, 134 (La.1983); see also, Crowe, The Anatomy of a Tort-Greenian, as Interpreted by Crowe who has been Influenced by Malone-A Primer, 22 Loy.L.Rev. 903 (1976).
Based on the facts of this case, we conclude that all four of the above inquiries cannot be answered affirmatively. The first element, causation in fact, requires that the defendant's conduct must have contributed to the plaintiff's harm in some substantial way. The omission on the part *1244 of the defendant which the plaintiff complains of and which must have contributed to the plaintiff's harm in order for causation in fact to exist, was a failure to warn the general public about the dangers inherent in eating raw oysters, specifically those dangers posed by the bacteria vibrio vulnificus.
Since this particular bacteria generally only affects persons with certain underlying risk factors, any warning would have necessarily been to the effect that if you have one of the underlying risk factors, you shouldn't eat raw oysters. The plaintiff was unaware that he had a liver problem, one of the underlying risk factors, and he had eaten raw oysters on previous occasions with no ill effects.
The Louisiana Supreme Court has held that although it is presumed that warnings will be heeded, this presumption can be rebutted if there is persuasive evidence that an adequate warning would have been futile under the circumstances. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). In this case we are persuaded that an adequate warning would have been futile given the evidence that the plaintiff did not know he had any of the underlying risk factors and that he had previously eaten raw oysters with no ill effects. Thus, the failure of the DHHR to warn the general public of the dangers of vibrio vulnificus was not a cause in fact of the plaintiff's harm.
Even if we were to conclude that a failure to warn was a cause in fact of the plaintiff's harm, the plaintiff has also failed to establish the remaining elements of his case under the duty/risk analysis.
After a careful analysis of the relevant statutory provisions we conclude that there was no statutorily imposed duty on the part of the DHHR to issue warnings about vibrio vulnificus.[3] However, since the DHHR had undertaken various studies of this bacteria, and since it knew that there was a danger posed by this bacteria to some small segment of the population, the DHHR certainly had a duty, once it had sufficient information, to issue some type of warning.
Nevertheless, we find that the DHHR fulfilled this duty when it published the Monthly Morbidity Report in August of 1982, a full year before the events which lead to this suit took place. This report summarized what the DHHR knew about vibrio vulnificus at the time, including the deadly effects it has on certain persons with underlying risk factors, what those risk factors are, and the proper methods of prevention and treatment. The report specifically stated that physicians should warn patients with any of the underlying risk factors not to eat raw oysters.
The fact that the DHHR chose not to aggressively disseminate the information contained in the Monthly Morbidity Report to the general public does not constitute a breach of the duty to warn. Since this bacteria only attacks a small percentage of the population, i.e., those with liver disease, kidney disease or other immuno-suppressive condition, the DHHR was reasonable in its conclusion that the best way to warn these people was through the medical community. The Monthly Morbidity Report was sent to every physician in Louisiana, the Center of Disease Control in Atlanta, Georgia, and the health departments of several states, including Mississippi. We hold that this satisfied the duty to warn incumbent on the DHHR due to its specialized knowledge and position of public trust.

ASSIGNMENTS OF ERROR 5, 6, AND 7
In light of our disposition of the previous assignments of error we pretermit consideration of assignments of error numbers 5, 6, and 7.

DECREE
Therefore, for the above and foregoing reasons the judgment of the trial court is reversed, and it is hereby ordered and decreed *1245 that plaintiff's suit be and is hereby dismissed at plaintiff-appellee's costs.
REVERSED AND RENDERED.
NOTES
[1] 1987 La.Acts No. 124, § 1 amended and reenacted former Article 8 as Article 6. New Article 6 of the Civil Code reproduces the substance of former Article 8 and is in accord with the jurisprudential interpretation of that article. It does not change the law. It provides: "In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."
[2] La.R.S. 40:4(A) provides in pertinent part:

"(2) In order to prevent the occurrence or spread of communicable diseases, the rules and regulations of the sanitary code shall provide for and require the reporting, investigation, and application and implementation of appropriate control measures to expressly include quarantine proceedings and measures, for all communicable diseases of public health significance. These rules and regulations shall also be designed to control rabies in dogs and to prevent rabies from occurring in humans.
....
"(13) The state health officer, through the office of health services and environmental quality, shall be expressly empowered and authorized to issue emergency rules and orders when necessary and for the purposes of controlling nuisances dangerous to the public health and communicable, contagious, and infectious diseases, and any other danger to the public life and health and health-safety."
Subpart (2) requires that the DHHR take action to prevent the occurrence or spread of all "communicable" diseases of public health significance. Subpart (13) empowers but does not require the DHHR to take action to prevent "infectious" diseases. "Communicable" and "infectious" are defined as follows:
"CommunicableThat can be transmitted (or can pass) from one person to another, as a disease. The method of transmission may be direct or indirect, as by touching the patient (and thus becoming contaminated by the germs) or by coming in contact with something the patient has touched, or with the patient's secretions.
"InfectiousPertaining to, or describing, a disease caused by the entrance of certain germs or little organisms into the body, thereby bringing on various forms of damage. For example, tuberculosis is an infectious disease; so is typhoid fever. Athlete's foot and ringworm are infectious diseases, being caused by the invasion of a fungus. On the other hand, the disease of the blood vessels known as arteriosclerosis is not, as far as it is known, an infectious condition. Non-infectious diseases may, however, lead to infections later on.
"Infectious does not mean the same as contagious, which refers to the transmission of a disease from one individual to another. An infectious disease may be contagious, and usually is, but need not be. For example, an infected gall bladder is not a contagious disease, since it cannot be communicated to another person.
"Infectious also means, in a slight variation of the concept, capable of being initiated or communicated by an invasion of disease-causing organisms, as through an abrasion or by direct injection of the germs with a needle." Houts, Courtroom Medicine, 400, 438 (1958). It follows that vibrio vulnificus induced septicemia is an infectious rather than a communicable disease as contemplated by the statute, and the DHHR's obligation to warn of it is therefore discretionary.
[3] See Footnote 2, supra.