BARRY, Judge.
In this personal injury action involving a serious wound infection from a bacteria in Lake Pontchartrain, Terry and Lina Verdun, plaintiffs-appellants, appeal a directed verdict and/or involuntary dismissal in favor of the State through the Department of Health and Human Resources (State and DHHR),[1] the City of New Orleans (City), and the Board of Levee Commissioners for the Orleans Levee District (Levee Board), and a directed verdict in favor of National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), the Levee Board’s insurer.
FACTS
On July 18, 1985 Mr. and Mrs. Verdun went trawling in Lake Pontchartrain. While putting their boat on the trailer at the Seabrook Bridge boat launch, the boat drifted off the rollers of the trailer. Mr. Verdun retrieved the boat, as he had “done a thousand times since a little boy” by walking knee deep into the water. Mr. Verdun was in the water for approximately 30 seconds. At that time Mr. Verdun had a varicose ulcer on his right shin which was caused by phlebitis, a pre-existing circulatory condition.
On July 19, 1985 Mr. Verdun and his family went to the Mississippi Gulf Coast. He stepped on a rock on the beach and sustained a cut on his left foot which may have come in contact with the Gulf water.
On July 20, 1985 Mr. Verdun was awakened by a burning and pulled muscle sensation in the back of his right leg. His temperature was elevated and his leg was edematous (severely swollen). He was hospitalized that evening in near septic shock and was placed in intensive care. He was diagnosed as having severe cellulitis and fascitis (infection of the skin, the fatty tissue beneath the skin, and the muscle covering or fascia) and infectious septicemia (infection involving the blood stream). The source of the infection was pathogenic vi-brio cholera non-01 type (a marine bacteria), which may have entered Mr. Verdun’s body when the ulcer on his right shin got wet at the Lake Pontchartrain boat launch.
The Verduns filed suit based on negligence against the City and Levee Board and on negligence and strict liability against the State. They claimed that ap-pellees breached their duty to monitor Lake Pontchartrain and warn the public of the health hazards in the polluted water.
In a bifurcated trial the Verduns presented their case against the City, Levee Board and State to the judge and their claim against National Union to the jury. At the close of their case the trial court granted a directed verdict and/or involuntary dismissal in favor of the three political entities and a directed verdict in favor of National Union.
LAW

Motion for Directed Verdict

La.C.C.P. art. 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion *1094 for a directed verdict is effective without any assent of the jury.
A motion for a directed verdict is properly granted in a jury trial when it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable minds could not reach a different verdict. In determining whether to grant a motion for directed verdict, the trial judge must consider the evidence in the light most favorable to the mover’s opponent. Armstrong v. Lorino, 580 So.2d 528, 533 (La.App. 4th Cir.1991), writ denied 584 So.2d 1166 (La.1991).

Motion for Involuntary Dismissal

La.C.C.P. art. 1672(B) provides:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
Unlike a motion for a directed verdict, a motion for involuntary dismissal requires a trial judge to weigh and evaluate the evidence and render a decision based on a preponderance of the evidence without any special inferences in favor of the mover’s opponent. Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.1991), writ denied 577 So.2d 1009 (La.1991); Sevin v. Shape Spa Four Health & Beauty, 384 So.2d 1011 (La.App. 4th Cir.1980). To prove a case by a preponderance of the evidence, the evidence taken as a whole must show “the fact or cause sought to be proved is more probable than not.” Barnes v. Thames, 578 So.2d at 1164 citing Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366, 369 (La.App. 2d Cir.1988).
It is difficult to discern from the oral reasons which standard was applied to each motion. However, under either standard the trial court properly granted the motions and dismissed appellants’ case.
NEGLIGENCE
The duty-risk analysis for determining liability in negligence actions involves the consideration of four factors:
(1) Was the conduct in question a cause in fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duties breached?
Mart v. Hill, 505 So.2d 1120 (La.1987).
ANALYSIS
The first element requires a determination as to whether the defendants’ conduct played a significant or substantial role in causing harm to Mr. Verdun. The Verduns claim that Mr. Verdun would have avoided contact with Lake Pontchartrain and, consequently, would not have been injured had the defendants properly monitored the water and adequately warned the public of the dangers lurking in the water.
The trial judge made no specific cause-in-fact determination, but stated:
Only in the broadest and generalist (sic) terms was [Mr. Verdun] aware of the pollution in Lake Pontchartrain. Although I don’t believe he knew of the nature of the contamination or the full extent of it, I note that from the evidence ... that ... the public entities through newspapers and/or television prior to July 18, 1985 did publish some articles ... or that there was some knowledge made known to the general public that there was a problem with Lake Pontchartrain. Insofar as how far that goes is another question.
The trial judge’s decision was based on a finding that no appellee owed or assumed a duty to monitor Lake Pontchartrain for pathogenic vibrio cholera non-01 or to warn boaters and fishermen of the hazards this marine bacteria presented. The City *1095 and Levee Board limited their arguments in their briefs to duty related issues.
The State submits that the public was adequately warned about the Lake’s intermittent pollution through signs and the news media. Specifically, in 1982 the Levee Board, pursuant to a DHHR request, placed a sign at the Seabrook Bridge swimming area which “recommend[ed] against swimming due to possible pollution.” In June of 1985 the sign was replaced with a sign which read “The Health Department states that the pollution level is high and swimming may be injurious to your health.” By July 3, 1985 the Levee Board placed three similar signs at Pontchartrain Beach and one sign at the Bayou St. John swimming area. On July 3, 1985 the Orleans Parish Sanitarian Services, an office of the DHHR, posted an additional sign at the Seabrook Bridge swimming area which read:
Notice. The water at this beach is subject to intermittent pollution, especially following heavy rainfall. Orleans Sanitarian Services.
The State and Levee Board introduced numerous articles from The Times-Picayune prior to July 17, 1985 which discussed Lake Pontchartrain’s pollution and its health risks. Moreover, the DHHR televised warnings during local news programs. The State argues that in light of those warnings, the alleged “failure to warn” was not a substantial factor related to Mr. Verdun’s injuries.
Mr. Verdun could not “honestly say either way” whether he had heard or read media warnings “that the Lake had been polluted and that you shouldn’t swim in it.” Mr. Verdun testified that no warning signs were visible from the boat launch. He said that on July 17, 1985 he was unaware of any warning signs , which may have been posted at the Seabrook Bridge swimming area or elsewhere along Lake Pontchartrain because he did not pass any such sign going to the boat launch. Mr. Verdun stated that he may have heard that sewerage was being pumped into the Lake. He admitted that he knew the Lake was polluted, but “not to the point of harming anyone.” Mr. Verdun testified that he would not have walked into Lake Pontchartrain if a warning sign had been posted at the boat launch.
When deciding whether particular conduct is a cause-in-fact of another’s harm, we do not consider if the conduct violated a statute or was negligent. American Wholesale Jewelers, Inc. v. American Druggist Ins. Co., 457 So.2d 244 (La.App. 3rd Cir.1984), writ denied 461 So.2d 316 (La.1984). Rather, this inquiry focuses on whether the conduct “had some direct relationship to the accident.” Id. After reviewing the evidence, we find that the defendants’ conduct was more probably than not a necessary cause of the accident.
If the lack of an adequate warning is proven to be a cause-in-fact of a plaintiff’s injuries, it is presumed that an adequate warning would have been heeded. Winstead v. Ed’s Live Catfish & Seafood, 554 So.2d 1237 (La.App. 1st Cir.1989), writ denied 558 So.2d 570 (La.1990). This presumption can be rebutted with evidence that an adequate warning would have been futile under the circumstances. Id.
The State contends a sign at the boat launch would have been futile. The State claims the evidence proves that Mr. Verdun historically disregards warnings concerning his health. For instance, Mr. Verdun failed to follow his doctor’s advice to lose weight to improve his phlebitis related problems.
Mr. Verdun testified that he tried to lose weight “on several occasions, many occasions ... and to very little avail, losing it, it bounces back.” His failure to lose weight does not prove that a warning sign at the launch would have been futile.
The State also claims that Mr. Verdun contacted the infection while visiting the Mississippi coast on July 18, 1985. Dr. Henry B. Bradford Jr., a microbiology expert and the State’s Public Health Officer, testified that vibrio cholera non-01 could be found in the Gulf of Mexico off of the Mississippi Gulf Coast when the water was at a certain temperature and salinity. That fact was confirmed by appellants’ marine *1096 biology expert, Dr. Gary E. Rodrick. Mr. Verdun testified that “he did not recall” touching the Gulf water. However, in a deposition introduced by the Levee Board on cross examination, Mr. Verdun stated that the “surf, might have washed across my feet in the water.” The State argues that if Mr. Verdun came into contact with the bacteria in Mississippi, there would be no causal connection between the State’s conduct and his injuries.
The trial judge found:
Mr. Verdun ... came into contact with the bacteria on the 18th of July, 1985 while briefly wading in the waters of Lake Pontchartrain at the Seabrook Bridge loading ramp in Orleans Parish while he was loading his boat onto a trailer. I parenthetically note that if you get down to the ultimate question of whether he did it or not, that I as a trier of fact believe that a preponderance of the evidence would so establish that this is where Mr. Verdun did come in contact with the vibrio cholera of the non-01 type.
The trial court’s factual finding concerning where Mr. Verdun came in contact with the bacteria was not manifestly erroneous or clearly wrong. We note that Mr. Verdun’s left foot sustained a cut in Mississippi, but it was his right leg that had the ulcer and ultimately became infected. We have no basis to disturb the trial court’s finding. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The next question requires a determination as to whether the State, Levee Board or City had a duty to protect the public from the health risk presented by the pathogenic vibrio cholera non-01 found in the Lake.
A legal duty may be imposed on a political entity “by legislation or by a rule of law.” Fowler v. Roberts, 556 So.2d 1 (La.1989) rehearing (La.1990). In the latter instance, the existence of a duty may be determined by considering “the case of association between the duty owed and the risk encountered,” as well as social, moral and economic factors. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). Foreseeability plays a part in determining the ease of association and focuses on “whether the injury is easily associated with the activity, not whether the defendant should have foreseen the plaintiff’s injuries.” McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227, 1234 (1984).
The Verduns contend that under Title 40[2] of the revised statutes the State had a duty or assumed a duty to discover the existence of vibrio cholera non-01 in the Lake and to promulgate rules and procedures to protect the public from health risks associated with the bacteria. They also argue that the State, like any landowner, has a duty to discover the unreasonably dangerous condition the bacteria created on its premises. They maintain that the Levee Board, owner of the boat launch, had a duty to discover the unreasonably dangerous condition associated with the adjacent water since use of the Lake was necessary to gain access to the boat launch. Alternatively, the Verduns aver that the Levee Board and City assumed a duty to warn the public by conferring with the State about the alleged health hazard and participating in decisions concerning public warnings.
As to the State’s statutory duty, the Ver-duns rely on La.R.S. 40:4 A(ll) and (13) and 40:5(2), (3), (10), (16), and (17) which provide:
A. The state health officer acting through the office of public health of the Department of Health and Hospitals, [formerly the DHHR] shall prepare, promulgate, and enforce rules and regulations embodied within the state’s sanitary code covering all matters within his jurisdiction as defined and set forth in R.S. 40:5. The promulgation of this sani *1097 tary code shall be accomplished in strict accordance with the provisions of the Administrative Procedure Act, R.S. 49:950 et seq., and further, in conformity with the following guidelines and directives:
******
(11) In order to protect the public from disease and injuries associated with water contact recreation (swimming), the state health officer shall prepare and promulgate rules and regulations necessary to insure that public swimming pools and recreational bathing places (natural and artificial) are constructed, operated, and maintained in a safe and sanitary manner. These rules may require the submittal of appropriate plans and specifications for review and approval. These rules and regulations shall insure that the design, construction, and operation of these facilities is such that the public is protected against the transmission of disease or injury by the establishment of water quality standards (chemical, physical, and bacterial); by proper arrangement of the physical features of the site or facility; and by proper procedures for supervision and maintenance of such premises.
******
(13) The state health officer, through the office of health services and environmental quality, shall be expressly empowered and authorized to issue emergency rules and orders when necessary and for the purposes of controlling nuisances dangerous to the public health and communicable, contagious, and infectious diseases, and any other danger to the public life and health and health-safety.
La.R.S. 40:4.
The State health officer and officer of public health of the Department of Health and Hospitals (formerly the DHHR) shall have exclusive jurisdiction, control, and authority:
(2) To take such action as is necessary to accomplish the subsidence and suppression of diseases of all kinds in order to prevent their spread.
(3) To enforce a sanitary code for the entire state containing provisions for the improvement and amelioration of the hygienic and sanitary conditions of the state.
******
(10) Over the reporting of communicable diseases.
[[Image here]]
(16) Over the sanitary conditions required at any public gathering or meeting.
(17) Over the adoption of rules and regulations regarding public health, sanitary, and hygienic subjects, including those for standards governing noxious odors.
La.R.S. 40:5.
Under Section 4, Subpart (11), the DHHR is required to promulgate rules or take action to protect the public from diseases which may be contracted in a “public swimming pool or recreational bathing place.” The State argues that application of this section is limited to natural or artificial swimming areas and excludes other water recreational areas such as a boat launch. Under Sanitary Code Chapter XXIV, subsection 24:001 “Natural Swimming Place or Bathing Place means any area in any natural watercourse or body of water in which people are immersed, or partially immersed, for swimming, recreational bathing, sporting events, therapeutic treatment, ceremonies, or any other related activities.”
We find that under section 4 subpart (11) the scope of the State’s duty encompasses promulgating rules and taking action to protect the public from diseases which may be contracted through water contact at a public boat launch. This duty also includes enforcing the relevant sanitary code provision, Chapter XXIV, section 24:027, which provides:
24:027 No natural or semi-artificial swimming pool or bathing place shall be operated when the water in said pool or place is determined by the State Health Officer to be so polluted as to constitute a menace to health if used for swimming or bathing. The owner or operator of *1098 any semi-artificial swimming pool or bathing place and the owner or operator of the ancillary facilities at any natural swimming place or bathing place shall conspicuously post the area as ‘unsuitable for swimming or bathing,’ whenever the State Health Officer has determined that the area is so polluted as to constitute a menace to health.
However, the extent of that duty is limited. The remaining sections relied on by the Verduns authorize but do not require DHHR to take action to prevent infectious diseases like vibrio cholera non-01 induced septicemia. See Winstead, 554 So.2d at 1243, n. 2. Nonetheless, reason dictates that since the DHHR is charged with protecting public health, it has a “duty” to exercise its authority and take action in a reasonably prudent and responsible manner.
As to the State’s duty as a landowner,[3] a landowner is required to “discover any unreasonably dangerous conditions and to either correct the condition or warn of its existence.” Socorro v. City of New Orleans, 579 So.2d at 939.
JoAnne F. McLean, Chief Sanitarian of the Orleans Parish Sanitarian Services, formerly the Office of Public Health of DHHR, is the primary enforcement officer of the sanitary code in Orleans Parish. Her responsibilities include overseeing water supply monitoring in Orleans Parish including Lake Pontchartrain. McLean testified that in June of 1985, in response to a media inquiry, her department began testing the water quality of the Lake’s designated swimming areas using the Department of Environmental Quality (DEQ) Water Quality Standards. She said those tests were conducted solely to determine fecal coliform levels. According to Ms. McLean, no other political entity participates in that series of tests, but as a matter of courtesy results were mailed to the City Health Director and the Levee Board.
The July, 1985 test indicated that the fecal coliform levels exceeded the amount allowable for primary contact recreation[4] as defined by the DEQ standards. Ms. McLean advised the State Health Director of the fecal coliform test results and she recommended closing the “swimming/bathing” areas to the public, informing the public of the findings, warning the public of the health hazards associated with Lake water contact, and permanently posting warning signs. She suggested “[t]hat the sign reflect the fact that water sampling results indicate fecal coliform counts in excess of standards set forth by the State of Louisiana Water Quality criteria ... [a]nd that swimming in these waters could pose potential health problems or be potentially hazardous to your health.”
As a result of Ms. McLean’s recommendations, DHHR issued a news release which was televised during local news programs at the beginning of July, 1985. Moreover, warning signs were posted in response to her recommendations. No sign was posted at the boat launch.
Dr. Sandra Robinson, State Health Officer and Secretary for DHHR in 1985, was responsible for overseeing the execution and enforcement of the Sanitary Code. In 1985, she authorized the posting of warning signs at the tested designated swimming areas as well as warnings via television and the newspaper. Dr. Robinson did not consider closing the Lake to be an appropriate response to the tests. She testified that the fecal coliform tests would not discover and produce data concerning other pollutants existing in the Lake. Dr. Robinson could not recall whether anyone had reported contracting an infection through contact with vibrio cholera non-01 type to the DHHR.
Dr. Richard M. Paddison, Medical Director for the Office of Preventive Medicine and Public Health of the DHHR in *1099 1985, testified that he forwarded the results of the fecal coliform tests to the Levee Board and City. The Levee Board and City agreed with Dr. Paddison that appropriate signs indicating that the Lake was polluted should be placed at the tested areas. Dr. Paddison said that none of the correspondence between himself, the Levee Board and City referenced vibrio cholera non-01 because DHHR was not testing for that bacteria nor would the fecal coliform tests indicate the existence of that bacteria.
Henry B. Bradford, Jr., a microbiology expert and Director of Laboratories for the Office of Public Health of DHHR, provided laboratory data to appropriate divisions within the Office of Public Health. Dr. Bradford attributed the excessive fecal coli-form counts to raw sewerage and urban run-off. He testified that excessive fecal coliform indicates the potential for having certain pathogens in the water. Dr. Bradford is concerned with pathogens which involve the intestinal tracts of humans and animals, such as Salmonellosis or Shigello-sis, because they would be excreted with fecal matter. Under normal conditions, he did not expect to find vibrio cholera non-01 in the intestines of feces of humans or animals. Vibrio cholera non-01 is more prevalent during warm months. Dr. Bradford opined that absent “very unusual circumstances” sewerage does not impact the existence of vibrio cholera non-01. He said that a high fecal coliform count may increase the likelihood of the existence of vibrio cholera non-01, but there is no direct relationship between the levels of fecal coli-form and vibrio cholera non-Ols. Hence, the 1985 fecal coliform tests provided no information on the existence or levels of vibrio cholera non-01.
From 1978 to approximately 1984, Dr. Bradford conducted a study which included vibrio cholera 01 and non-01. According to Dr. Bradford, the process for testing vibrio cholera non-01 is more difficult and laborious than the fecal coliform test. Identifying the non-01 type may take one week to ten days. He stated that a test producing a vibrio cholera non-01 count would be meaningless since all non-Ols are not pathogenic to man.
As a result of the vibrio study, a contingency plan was developed to protect the public from classic cholera, an 01 related disease, since it presented a significant public health threat. Conversely, Dr. Bradford stated that no action was taken to protect the public from non-01 associated diseases which “seem to be very limited and do not represent, at least in some people’s minds, a substantial public threat even though individuals ... have come down with diarrheal disease due to non-Ols.” He did not consider the risks associated with vibrio cholera non-01 to be substantial, particularly the risk of a wound infection “because we obviously have a large number of people enjoying lots of water sports and they do not come down with non-01 infections.” However, Bradford opined that Mr. Verdun’s risk of contracting a vibrio cholera non-01 or any other bacterial infection was increased because of the ulcer and open wound on his skin.
Dr. Bradford considers vibrio cholera non-01 to be a free living organism requiring no intervention by man for its exist ence. This bacteria can be found in Louisiana, Mississippi, Texas, or any other coastal state when the water is the appropriate temperature and salinity, and is prevalent during warm months. It has its own niche in the environment and “has been there from time immemorial and will be there for an extended period of time.”
Gary E. Rodrick, defendants’ microbiology expert, offers no support for their proposition that there is a relationship between high fecal coliform counts and the existence of vibrio cholera non-01.
Dr. Louise McFarland, an epidemiology and public health expert and Chief of Epidemiology of DHHR, was charged with investigating and preventing communicable and infectious diseases. Dr. McFarland recalled that three cases of vibrio cholera non-01 infections from Lake water had been reported to her office prior to July, 1985. She testified that most vibrio cholera non-01 infections cause gastrointestinal illness such as diarrhea, not wound *1100 infections. Based on the low number of reported infections, she considers the risk of infection as “very low” and would not support a warning to the general public.
Dr. Brobson Lutz, a public health expert and Director of the City’s Health Department, testified that the City did not participate in the decision making process to warn the public about potential health hazards associated with the Lake’s water. However, he agreed that signs indicating that the Lake was subject to intermittent pollution should be placed at swimming sites. Dr. Lutz informed Dr. Paddison that he believed there was insufficient evidence substantiating the existence of a Lake related health risk. In fact, no major illness from Lake water contact had been reported to Dr. Lutz. He was opposed to closing the swimming areas because he believed that people would disregard the closure. According to Dr. Lutz, the fecal coliform count does not serve as an indicator for a vibrio cholera count. Additionally, he said that the vibrio cholera non-01 in the Lake does not present a significant health risk and it has been “there as long as Lake Pontchartrain has been there.”
Captain Humphrey Baylor Lansden, Managing Director of the Levee Board, testified that the Levee Board owns and maintains the boat launch. In 1982, DHHR advised Capt. Lansden of a potential health hazard associated with the Seabrook Bridge swimming area; the DHHR never told him that a health hazard existed in the water adjacent to the boat launch. The Levee Board reviewed the DHHR data and determined that it did not have authority to close the Lake or prohibit swimming. The Levee Board decided to cooperate with DHHR in providing information to the public, including signs pursuant to DHHR’s recommendations concerning verbiage and placement.
We note that the Seabrook Bridge boat launch and Lake Pontchartrain have great social utility since they are among the few free outdoor recreational areas open to the public. Mr. Verdun had been fishing when he was injured. Signs warning of every bacteria which may cause injury would effectively close the Lake.
Vibrio cholera non-01 is a free-living marine bacteria found in any body of water of a certain salinity and temperature. It is a naturally occurring organism that has always been present in the environment. Its presence is not the result of pollution or other cause by humans. It may be pathogenic (capable of causing disease) or non-pathogenic. Most importantly, it rarely very causes an illness. The risk of suffering a wound infection, like Mr. Verdun’s, is statistically insignificant. Although vibrio cholera non-01 is generally in the Lake during warm months, it is almost always innocuous to humans.
Based on the evidence, vibrio cholera non-01 does not pose a significant health risk, especially to a person who only has momentary contact with the water. The evidence does not indicate that the Lake posed any danger other than those normally associated with all warm, brackish salt water. The likelihood that Mr. Verdun would contract a vibrio cholera non-01 induced wound infection through an open ulcer while stepping into Lake Pontchartrain for 30 seconds is far too remote to be considered an unreasonable risk of harm.
Therefore, under these facts, vibrio cholera non-01 does not present an unreasonable risk of harm and the State had no duty to monitor the Lake and warn the public of any health hazard. There is no evidence that any defendant assumed such a duty. Moreover, absent an unreasonably dangerous condition, the Levee Board owed no duty to persons using the Seabrook Bridge boat launch.
STRICT LIABILITY

Article 2317

To find the State, as owner of the Lake,[5] strictly liable under La.C.C. art. 2317, the Verduns were required to prove that “(1) the thing which caused damage was in the defendant’s custody and control (garde); (2) the thing had a vice or defect *1101 which created an unreasonable risk of harm; and (3) the injuries were caused by the defect.” Socorro, 579 So.2d at 937 (emphasis omitted). The inquiry for determining “whether a risk is unreasonable under Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem.” Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983).
We have already concluded, based on the facts, that vibrio- cholera non-01 in the Lake and the State’s failure to warn of its health hazards in 1985 did not present an unreasonable risk of harm. In view of that finding, the record does not support article 2317 strict liability against the State.
STRICT LIABILITY

Article 2322

To find the Levee Board, as owner of the boat launch, strictly liable under article 2322 for an allegedly defectively designed boat launch, the Verduns were required to prove that the boat launch was a “building” which created an unreasonable risk of harm to others and that damage was caused by that risk. Entrevia, 427 So.2d at 1148.
The Levee Board correctly points out that this theory of liability was never pled nor included in the pre-trial order. No evidence was adduced at trial to prove the theory and thereby enlarge the pleadings. See Roberson v. Provident House, 576 So.2d 992 (La.1991). The trial court did not err by concluding that the Levee Board was not strictly liable.
The record does not support any basis for recovery. The judgment is affirmed.
AFFIRMED.

. State agencies will be referred to as they existed in 1985. Procedural issues raised by changes within State agencies will not be addressed.

. The State through the office of public health of the DHHR is responsible for “the preparation and supervision of the sanitary code.” La.R.S. 36:258(B). In brief, the Verduns and the State mistakenly refer to Title 40 as the sanitary code. La.R.S. 40:3 et seq., set forth matters which must or may be regulated by the sanitary code.

. We need not determine at this time whether the DHHR was the proper party defendant under a landowner liability theory of negligence.

. Primary contact recreation is defined as "any recreational or other water use in which there is prolonged and intimate contact with the water involving considerable risk of ingesting water in quantities sufficient to pose a significant health hazard such as swimming, water skiing, skin diving, wading, and other similar activities."

. See footnote 3.