627 So.2d 233 (1993)
Rosa Mae AMBROSE, et al.
v.
NEW ORLEANS POLICE DEPARTMENT AMBULANCE SERVICE, et al.
No. 92-CA-2238.
Court of Appeal of Louisiana, Fourth Circuit.
November 18, 1993.
*235 David W. Oestreicher, II and Jim Uschold, Oestreicher & Hackett, New Orleans, for plaintiffs/appellants.
Margaret Bradley, Metairie, for defendants/appellants, Duncan Lill and St. Paul Fire and Marine Ins. Co.
Earl G. Perry, Jr., Deputy City Atty., Brett J. Prendergast, Chief of Civ. Litigation, Dan Zimmerman, Acting Chief Deputy City Atty., and William D. Aaron, City Atty., New Orleans, for defendant/appellant, the City of New Orleans.
Before ARMSTRONG, JONES and WALTZER, JJ.
ARMSTRONG, Judge.
In this wrongful death and survival action, both plaintiffs, Rosa Mae Ambrose, Gail Ray, Linda Thomas and Warren Ambrose, and defendants, the City of New Orleans (the "City"), Timothy Dodson, Duncan Lill, and Lill's insurer, St. Paul Fire and Marine Insurance Company ("St. Paul"), appeal portions of a trial court judgment awarding plaintiffs damages in the amount of $640,000.00.
The action arose out of the death of Wilton J. Ambrose Jr., who was pronounced dead of cardiac arrest shortly after being taken to Jo Ellen Smith Hospital by a New Orleans Police Department ambulance in the early morning hours of July 18, 1983. Plaintiffs originally filed this action against the New Orleans Police Department Ambulance Service and Travelers Insurance Company. Subsequently, plaintiffs amended their petition to delete the named defendants and add as defendants the City, emergency medical technicians Timothy Dodson and Duncan Lill, and Lill's insurer, St. Paul.
At approximately 2:00 a.m. on July 18, 1983, the decedent complained to his wife, Rosa Mae Ambrose, that he was not feeling well. Because of some medical conditions he sometimes had problems getting out of bed. Mrs. Ambrose helped him out of bed to go to the bathroom. He sat on the toilet and again complained that he was feeling bad. Eventually, he asked his wife to call the couple's two daughters, plaintiffs Linda Thomas and Gail Ray. Gail Ray, with her husband Willie, arrived at her parents home on Whitney Avenue first. The decedent was still sitting on the toilet. Ray and her husband helped get her father up and walked him back into his bedroom where they sat him in a lounge chair.
The decedent had a history of circulatory and respiratory problems, as well as diabetes. Although no family members were apparently aware of this, the decedent had recently been to the emergency room of the Veteran's Administration Hospital complaining of chest pains. Ray testified that her father told her that he needed an ambulance and oxygen. Ray called for two ambulances, one from Medic One and one from the New Orleans Police Department ("NOPD"). Meanwhile, the decedent's other daughter, Linda Thomas, and her husband, Hudson Thomas, arrived at the Ambrose house. The Medic One ambulance subsequently arrived and the EMTs began administering oxygen to the decedent, taking vital signs and attempting to get the decedent's medical history from family members.
An NOPD ambulance run report reflects that NOPD EMTs, Dodson and Lill, received the dispatch at approximately 2:57 a.m. and arrived at the Ambrose home at approximately 3:00 a.m. The Medic One EMTs were "basic" EMTs. Dodson and Lill were "intermediate" EMTs. It was established at trial that state and national EMT standard operating procedures dictated that in such a situation the intermediate EMTs were to take over from the basic EMTs. Accordingly, Dodson proceeded to obtain vital signs from the decedent while Lill attempted to get decedent's medical history from family members.
*236 Lill questioned Gail Ray but she referred questions to her mother. Lill testified that the family did not know much about the decedent's medical history and were under the impression that the decedent was suffering from a respiratory condition, specifically, bronchitis. Lill stated, however, that decedent's signs and symptoms appeared to be of a cardiac nature. Mrs. Ambrose eventually gave Lill a box of decedent's medication. Family members testified that during this period the decedent complained of pain and asked to be taken to the hospital.
Gail Ray and her brother-in-law Hudson Thomas testified that they never saw Lill or Dodson ask the Medic One EMTs for any information already obtained by Medic One. Lill testified that he spoke with the Medic One EMTs but that they had not yet obtained vital signs and had been unable to get a coherent medical history from family members. Lill said that Medic One had gathered "extremely little" helpful information. Neither of the two Medic One EMTs testified at trial.
NOPD brought its stretcher into the living room of the Ambrose home but Lill determined that the stretcher would not make the turn into the decedent's bedroom from a narrow hallway off the living room. Family members suggested that Lill could take the stretcher from the living room through the kitchen into the bedroom. Lill determined that he could not fit the stretcher through the doorway and asked decedent's sons-in-law, Hudson Thomas and Willie Ray to help walk the decedent from his bedroom through the kitchen to the stretcher in the living room. Lill admitted that he made no attempt to get the stretcher through the door but made a judgment that it would not fit. As his sons-in-law helped him walk to the stretcher, one of the NOPD EMTs carried the oxygen tank the decedent was breathing from. Once the decedent was situated on the stretcher, the NOPD EMTs asked him to move up a little so they could place the oxygen tank between his legs. They also disconnected Medic One's oxygen tank and connected theirs.
The decedent was taken outside on the stretcher and loaded onto the ambulance. Lill testified that as they were putting decedent into the ambulance he lost consciousness. Decedent's son-in-law testified that he looked inside of the ambulance to see Lill turned away from the decedent and the decedent apparently not breathing. Thomas, a respiratory therapist by vocation, knocked on the door, entered the ambulance, and he began performing chest compressions while Lill inserted an esophageal obturator airway ("EOA") tube and, using an "ambao" bag, began respirating the decedent. They were unsuccessful in reestablishing the decedent's breathing. NOPD transported the decedent to Jo Ellen Smith hospital, arriving at approximately 3:20 a.m. The decedent never regained spontaneous breathing and was pronounced dead at 3:52 a.m.
At the close of plaintiffs' case, defendants moved for a directed verdict as to the claim of Warren Ambrose, the decedent's son, who did not testify or make an appearance at trial. At the end of trial this motion was granted. The trial court also granted a directed verdict in favor of plaintiffs on the issue of comparative negligence. The jury found that the conduct of defendants Dodson and Lill amounted to gross negligence and awarded Rosa Mae Ambrose $475,000.00, $25,000.00 each to Gail Ray and Linda Thomas, and $115,000.00 to the estate of the decedent. Defendants' motion for remittitur and alternative motions for judgment notwithstanding the verdict and new trial were denied by the trial court.
On appeal defendants raise seven assignments of error. Plaintiffs raise two. We first address defendants' assignments of error.

PEREMPTORY CHALLENGES
Defendants claim the trial court erred in failing to find that they made out a prima facie case that plaintiffs used five of their six peremptory challenges to systematically exclude whites from serving on the jury, in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution. Two white and ten black persons were *237 selected to serve on the jury.[1]
In Edmonson v. Leesville Concrete Co., Inc., ___ U.S. ___, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), the U.S. Supreme Court held that exclusion on the basis of race violates a prospective juror's equal protection rights. Edmonson extended the application of the court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In order to preserve a Batson complaint that a party's use of a peremptory challenge was based on race, the opposing party must make an objection before the entire jury panel is sworn. Cf. State v. Williams, 524 So.2d 746 (La.1988). The record reflects that counsel for defendants did not object to the challenges until after the jury was sworn. Therefore, the objection was not timely.

DEPOSITION OF DR. NERI
The deposition of Dr. Gerald A. Neri was taken in March 1986 in the state of New Jersey where he resided. During his opening statement at trial, counsel for plaintiffs informed the jury that he would be presenting the deposition of Dr. Neri. Counsel for defendants subsequently objected, claiming that they had not received proper notice of plaintiffs' intention to use Dr. Neri's deposition in lieu of his live testimony.
La.C.C.P. art. 1450, governing the use of depositions, and as in effect at the time of trial, provided in part:
A. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
* * * * * *
(3) the deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
* * * * * *
(b) That the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; ...
* * * * * *
(5) However, any party may use the deposition of an expert witness for any purpose upon notice to all counsel of record, any one of whom shall have the right within ten days to object to the deposition, thereby requiring the live testimony of an expert. The objecting counsel of record shall pay in advance the fee, reasonable expenses, and actual costs of such expert witness associated with such live testimony. The fees, expenses, and costs specified in this Paragraph shall be subject to the approval of the court.
Subparagraph (A)(5), as quoted above, and relating only to expert witnesses, was added to C.C.P. art. 1450 in 1991. In 1992, by Acts 1992, No. 645, § 1, the legislature added the following language to Subparagraph (A)(5):

The provisions of this Subparagraph do not supersede Subparagraph (A)(3) nor Code of Evidence Article 804(A). However, the court may permit the use of the expert's deposition, notwithstanding the objection of counsel to the use of that deposition, if the court finds that, under the circumstances, justice so requires. (Emphasis added.)
Prior to the addition of Subparagraph (A)(5) in 1991, it is reasonable to assume that the provisions of Subparagraph (A)(3) applied equally to lay and expert witnesses. There is nothing to indicate otherwise. Following the addition of Subparagraph (A)(5) in 1991 there apparently was some confusion as to whether Subparagraph (A)(3) still applied to expert witnesses. Subsequently, in 1992, the legislature clarified the statute by adding language to Subparagraph (A)(5) specifically *238 stating that it does not supercede Subparagraph (A)(3). Thus, at the time of trial in the instant case the depositions of expert witnesses could be offered in evidence under either Subparagraph (A)(3) or Subparagraph (A)(5).
In arguing her objection to the introduction of Dr. Neri's deposition, counsel for defendants admitted that Dr. Neri resided out of state. Dr. Neri resided at a distance greater than 100 miles from the place of trial and therefore his deposition was admissible under C.C.P. art. 1450(A)(3)(b).

NEGLIGENCE
The jury found that the acts or omissions of Dodson and Lill were grossly negligent and resulted in harm to the decedent. Louisiana employs a duty-risk analysis to resolve negligence cases. Faucheaux v. Terrebone Consolidated Government, 615 So.2d 289 (La.1993); Coblentz v. North Peters Parking, Inc., 533 So.2d 98 (La.App. 4th Cir.1988). In making the requisite analysis, four questions are to be considered:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What duty, if any, was owed by the respective parties?
(3) Was the requisite duty breached?
(4) Was the risk and harm caused within the scope of protection afforded by the duty breached?
Mart v. Hill, 505 So.2d 1120 (La.1987). For plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered. Faucheaux, supra.
(1) Cause-in-fact:
Cause-in-fact is generally a "but for" inquiry; if the plaintiff probably would not have sustained the injuries but for the defendant's substandard conduct, such conduct is a cause-in-fact. Fowler v. Roberts, 556 So.2d 1, 5 (La.1989). To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
The harm allegedly caused by defendants was the loss of the decedent's chance of survival. Cf. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Smith v. State, Through the DHHR, 523 So.2d 815 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La. 1986) ("Defendant's conduct must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause."); Hampton v. Greenfield, 576 So.2d 630 (La. App. 4th Cir.1991), writ denied, 581 So.2d 686 (La.1991). Plaintiffs must establish that the decedent had a chance of survival, and that the defendants' conduct was a substantial factor in depriving the decedent of that chance of survival.
Whether or not defendants' conduct was a cause-in-fact of the loss of the decedent's chance of survival and the resulting harm to plaintiffs is a question of fact. This court's function on appellate review is to determine whether the evidence was sufficient for the jury to find that the conduct in question was a cause-in-fact of plaintiffs' damages, and whether such a finding was clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In the instant case the only conduct complained of which could have been found to be the cause-in-fact of plaintiffs' damages was the EMTs alleged delay in getting the decedent to the hospital, and the aggravation of his condition by making him walk with assistance to the stretcher. While there was testimony concerning the EMTs failure to verify Lill's correct placement of an EOA breathing tube, there was no evidence indicating that it had been improperly placed. The jury would have been clearly wrong to find that the EOA tube had been improperly placed. Also, even though after getting the decedent on the stretcher the EMTs asked the decedent to move himself a little so they could place the oxygen tank between his legs, there is no evidence that this was below the applicable standard of care or that it was a cause-in-fact of the loss of the decedent's *239 chance of survival. The jury would have been clearly wrong to find otherwise.
The decedent's son-in-law, Hudson Thomas assisted Lill in performing CPR after the decedent stopped breathing while being loaded onto the ambulance. Thomas was a certified respiratory therapist trained in the administration of CPR. There is no evidence that this contributed in any way to the decedent's death. In fact, the expert witnesses who addressed this action, including Dr. Neri, plaintiffs' expert, stated that it was appropriate and more effective than if Lill had done the CPR alone. (Dodson was driving the ambulance.) The jury would have been clearly wrong in finding otherwise.
The record reflects only two areas of conduct bearing on the question of cause-in-fact: (1) the EMTs decision to have the decedent walk to the stretcher and, (2) whether it took too long to get the decedent to the hospital.
James Hugh Shewmaker testified on behalf of plaintiffs as an expert in the field of pre-hospital emergency care. Schewmaker testified that the amount of time the ambulance report reflected that the EMTs spent at the Ambrose home, 20 minutes, was "greatly excessive" and not in accordance with the appropriate standard of care. He said that, based on the decedent's symptoms, even a basic EMT should have concluded there was a sufficient possibility that the decedent was having a heart attack. While he stated that it was appropriate for the NOPD EMTs to have elicited a history and taken vital signs from the decedent, it was his opinion that they took too long to do this. He estimated that a reasonable time frame to accomplish everything in the home would have been 10-12 minutes. Shewmaker further testified that there "was more than enough room" to get a standard stretcher from the living room to the kitchen to the hallway outside the decedent's bedroom and "a reasonably good chance" the EMTs could have gotten the stretcher into the bedroom. It was his opinion that the failure to bring the stretcher to the decedent was a breach of the applicable standard of care. Shewmaker testified that he personally had seen an actual "cot" with a body on it put through the doorways in question.
The deposition of Dr. Gerald A. Neri was read to the jury. Dr. Neri was board certified in emergency medicine and a Louisiana state certified EMT instructor. Dr. Neri felt that 20 minutes on the scene was unacceptable and that it was inappropriate to have a patient with the decedent's symptoms walk to the stretcher. He said that walking the decedent to the stretcher may or may not have been enough exertion to hurt him. He stated that there was a probability that the decedent could have either been prevented from going into ventricular fibrillation or that it could have been controlled had the EMTs acted faster. He said the sooner a patient is put on xylocaine the less chance he has of going into ventricular fibrillation and the greater his chance of survival. The record reflects that Overall, Dr. Neri was unable to say with any degree of certainty that any acts or omissions on the part of the EMTs caused the decedent's death.
Dr. Norman McSwain testified on behalf of defendants and was accepted as an expert in the field of emergency medicine. Dr. McSwain testified that he found no evidence of gross negligence on the part of the NOPD EMTs, and stated that their actions were within acceptable standards of care for EMTs in 1983. He testified that 20 minutes was not an inappropriate amount of time to spend at the scene. Dr. McSwain agreed that, generally, when dealing with a cardiac patient there should be minimum of physical exertion. He admitted that walking is an exertion, but said he wasn't sure whether it was any more of an exertion than putting a patient on a stair chair (a folding maneuverable stretcher) or trying to do something else to lift the patient up to a stretcher. Dr. McSwain said the EMT has to make a judgment as to the best way to get the patient to the stretcher. He added that he had personally asked a cardiac patient to walk with assistance on more than one occasion.
Dr. McSwain testified that his review of Jo Ellen Smith Hospital records indicated that the decedent had an asystole cardiac arrest rather than a ventricular fibrillation. He further stated that the survival rate is only 5-10 percent in patients who experience asystole. He admitted on cross-examination, *240 however, that it was possible that the decedent was in ventricular fibrillation. He stated that the sooner such a patient is defibrillated the greater his chance of survival. Defibrillation had to be done at the hospital. However, he stated that if the decedent had gone into ventricular fibrillation, presumably at the point where he stopped breathing, since CPR was started very quickly and the decedent gotten to the hospital within 8 minutes, his chance of survival could have approached 40 percent. Based on his review of records from Jo Ellen Smith Hospital, Dr. McSwain doubted whether the ultimate outcome would have been any different had the decedent been in the hospital emergency room when he went into cardiac arrest.
Laura Gore testified on behalf of defendants and was qualified as an expert in the field of pre-hospital emergency care. Ms. Gore testified that she was presently, and had been since 1983, an EMT instructor for basic, intermediate and paramedic EMT courses. She testified that the care rendered by Lill and Dodson met the standard of care for EMTs in 1983. She said it was standard procedure in New Orleans and nationwide for intermediate EMTs such as Lill and Dodson to take over from basic EMTs such as those from Medic One. She stated it was appropriate to get a report from the Medic One EMTs and that if they did not get enough information, get the information themselves. She said it was appropriate to get a medical history and to check for vital signs. She also said it was important to determine whether the decedent was experiencing cardiac or respiratory problems and that in this case, the decedents' family gave a history of respiratory problems, not heart problems.
Ms. Gore stated that often, it is more stressful to lift a patient than to have them walk. She admitted, however, that with a patient exhibiting signs of cardiac distress, it's appropriate to minimize physical exertion. She also said that when a patient is in distress, the paramount priority is to get the patient to an advanced life support system in a hospital. It was Ms. Gore's opinion that 20 minutes on the scene was not inappropriate.
Ben Giovingo testified on behalf of the defendants and was qualified as an expert in the field of pre-hospital emergency care. Giovingo had been a certified EMT instructor at all three EMT levels, basic, intermediate and paramedic, since 1978. Giovingo testified that Dodson and Lill acted appropriately and followed the protocols existing at that time. He said it was standard operating procedure, state and nationwide, for intermediate EMTs to take over from basic EMTs. Giovingo stated that prior to 1984, the priority for EMT's was to get on the scene and stabilize the patient before transporting him to the hospital. He referred to it as "stay and play." Since 1984, he testified, the primary focus is on expeditiously transporting the patient to the hospital. He said that even if the EMT made an immediate assessment that the patient was going to be transported to the hospital, the EMT would not skip the medical history and vital sign check. He said it was a definitive part of the EMTs' care on the scene to get this information and to determine whether the decedent was suffering from pulmonary or cardiac distress. He testified that EMTs absolutely could not work outside the protocols. Giovingo said that 20 minutes on the scene in this case was appropriate.
Giovingo stated that it was a judgment call on the part of the EMTs to walk the decedent to the stretcher. He said that if the stretcher would not fit, and if a stair chair was not available, then walking the patient to the stretcher would be okay. It is unclear whether the NOPD ambulance was equipped with a stair chair at the time of this incident. Giovingo felt that a two or four-man lift of the patient would have been more stressful than walking him.
Duncan Lill testified that he obtained little information from the Medic One EMTs and had to get a medical history from family members himself. He stated that he did not believe he could get the stretcher through the doorway. He made the judgment that to attempt to do so would be a waste of precious time. Lill testified that the stretchers the NOPD ambulances were equipped with were significantly longer than normal stretchers. He said he did not know whether or not *241 there was a stair chair on board the ambulance. He believes having family members help carry a patient causes the least amount of stress for the patient. Lill believed that, getting the sons-in-law to walk the decedent with assistance was the quickest and least stressful method of moving him the 12 or 14 feet to the stretcher. Lill felt that they had spent a shorter amount of time on the scene than 20 minutes. He said they did everything as expeditiously as possible and did not delay.
Timothy Dodson testified that the NOPD stretchers in 1983 were 6-8 inches longer than stretchers they had used in the past. However, he had no recollection as to whether the stretcher could have fit through the doorway in the Ambrose home. As to the times listed on the ambulance run report, Dodson stated that the times could be estimates or accurate.
Gail Ray, the decedent's daughter and a nurses aide who had worked in hospital emergency rooms, testified that she had seen stretchers and that it would have been "no problem" getting the NOPD stretcher into the bedroom through the kitchen. Ray stated that Lill was asking some of the same medical history questions of family members that the Medic One EMTs had asked. She said her father kept saying, "Get me out of here, just get me out of here."
Willie Ray, Gail Ray's husband, testified that Medic One had asked about the decedent's medical history and that the NOPD EMTs also asked about the history. He first said that he and Hudson Thomas "carried" the decedent to the stretcher but, later, said the decedent had to "more or less" walk on his own to the stretcher while he and Thomas braced him up on either side. Photos introduced into evidence by plaintiffs show Ray and Thomas demonstrating, with Linda Thomas acting the part of the decedent, how they helped the decedent to the stretcher. The photos depict Hudson Thomas and Willie Ray holding Linda Thomas up. Her arms are around the men's shoulders, with each man holding one of her hands and holding her around her waist, and her knees are slightly bent. Ray also testified that the decedent was saying "get me out of here." Ray said a few minutes later the EMTs took him to the hospital.
Linda Thomas testified that the NOPD EMTs finally got the stretcher after the decedent kept asking to get out of there. Thomas said she had seen hundreds of stretchers and that the one she saw fit through the living room doorway of the Ambrose home after her father's death appeared to be the same size as the one used by the NOPD EMTs. Thomas thought it had taken longer than 20 minutes for the EMTs to get moving to Jo Ellen Smith Hospital.
Hudson Thomas, Linda Thomas's husband and the decedent's son-in-law, testified that Medic One had already obtained a medical history and NOPD came in and "began getting the history again." Thomas testified that it would be fair to say that the decedent had to exert himself to get to the stretcher. He said he recalled the decedent pleading "Get me out of here, I have to go to the hospital." Thomas also testified that on the night before trial he brought a stretcher into the decedent's bedroom through the kitchen, as family members had suggested to Lill on the night in question. Thomas said the stretcher he fit through the kitchen into the decedent's bedroom was approximately the same size as the NOPD stretcher used by Lill and Dodson.
Considering the evidence as a whole, we are unable to say that the evidence was insufficient for the jury to conclude that the decedent had a chance of survival and that the actions of the NOPD EMTs in spending too much time at the scene and walking the decedent to the stretcher were a cause-in-fact of that loss of a chance of survival.

(2) Duty:

Emergency medical technicians have a duty to comply with the applicable standard of care. The applicable standard of care for EMTs is that degree of care ordinarily exercised by emergency medical technicians in the state of Louisiana and the New Orleans metropolitan area. Cf. La.R.S. 9:2794.

*242 (3) Breach of Duty:

Ordinarily, a violation of the applicable standard of care would be negligence and would render the EMT liable. However, La. R.S. 40:1235(A) places a heavier burden on a plaintiff to show a breach of an EMT's duty of reasonable care. R.S. 40:1235(A) provides for immunity for civil damages for emergency medical technicians and states in pertinent part:
(1) Any basic, intermediate, or paramedic emergency medical technicians certified pursuant to the terms of this Part who render emergency medical care to a person while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such a person for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such person. Nothing herein shall relieve the driver of the emergency vehicle from liability arising from the operation or use of such vehicle.
(2) The immunity granted herein to basic, intermediate, and paramedic emergency medical technicians by the provisions of this Part shall extend to parish governing authorities, police departments, sheriffs' offices, fire departments, or other public agencies engaged in rendering emergency medical services and its insurers with respect to such medical services unless the emergency medical technician employed by said agencies would be personally liable under the provisions of Paragraph (1).
The trial court charged the jury on the standard of gross negligence and the jury found that Dodson and Lill had been grossly negligent. On appeal defendants argue that such a finding was clearly wrong. Plaintiffs argue on appeal that the gross negligence standard of R.S. 40:1235(A) applies only if the EMTs are "following the instructions of a physician" while in direct contact with that physician, not, as the EMTs in the instant case were doing, following the "protocols" or prescribed set of instructions established by physicians of the Orleans Parish Medical Society. Dr. McSwain testified that in 1983, EMTs in New Orleans worked "only" under protocols issued by the Orleans Parish Medical Society. Therefore, accepting plaintiffs' argument, in 1983, no EMTs would have enjoyed the qualified immunity provided by R.S. 40:1235(A) because they all operated under standing protocols.
Also, prior to 1987, R.S. 40:1235(A) provided for qualified immunity for EMTs and the agencies employing those EMTs. Subparagraphs (B), (C) and (D), respectively, provided for immunity for physicians or surgeons who provided instructions to EMTs by the use of electronic or other means of transmission; hospital facilities allowing the use of telemetry or other equipment to maintain contact between EMTs and physicians (except for grossly negligent acts or omissions); and EMT supervisors, instructors or trainers.
In 1987, R.S. 40:1235 was amended to add Subparagraph (A)(3) which provides for immunity from civil damages for, among other organizations, parish medical societies and their individual members. The immunity extends to acts or omissions "including, without limitation, advice, instructions, or other duties regarding policy, protocol, administration, and efficiency of the emergency medical services system." The immunity does not extend to "wanton or willful acts or omissions."
Medical societies are presumably composed of individual member physicians. It is reasonable to assume that the addition of Subparagraph (A)(3) was intended to clarify an apparent inequity in the immunity provisions. That is, one physician would be immune under Subparagraph (B) when he provided instructions to EMTs by the use of electronic means, while another physician who was a member of, for instance, the Orleans Parish Medical Society, and who gave instructions to EMTs through the establishment of protocols, would not enjoy that immunity. La.R.S. 40:1235 specifically provides that physicians may provide "instructions" directly to EMTs by electronic or other means (R.S. 40:1235(B)), or "instructions" through the issuance of protocols (R.S. 40:1235(A)(3)). Again, in 1983 the New Orleans *243 EMTs operated only under the protocols. It is reasonable to assume that the legislature always intended that the phrase "following the instructions of a physician" in Subparagraph (A)(1) cover both types of "instructions."
A simple hypothetical exposes a major flaw in plaintiffs' argument. Two EMTs perform pulmonary ventilation on two different patients by the use of EOAs. There is no question that in both cases the pulmonary ventilation with the EOA was the correct medical procedure indicated. One EMT performs the procedure pursuant to standing protocols and the other pursuant to the direct order of a physician with whom the EMT is in contact. Both ventilation procedures are performed in a manner clearly amounting to ordinary, but not gross, negligence. Accepting plaintiff's interpretation of the immunity provision, the EMT who initiated the pulmonary ventilation in accordance with standing protocols could be found liable for civil damages, but not the EMT who initiated the procedure on the direct order of a physician. The conduct of both EMTs was equally negligent but one would be immune from civil damages and the other would not. We decline to accept an interpretation of the statute which could lead to such a result.
"Gross negligence" has been defined as "the want of even slight care and diligence" or the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (1942). It is "the entire absence of care" or the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953).
Plaintiff's expert, James Shewmaker, found that Lill and Dodson did not comply with the applicable standard of care in (1) failing to bring the stretcher to the decedent and, (2) in spending 20 minutes at the scene. Dr. Gerald Neri's deposition testimony also indicates that the EMTs breached their duty in regard to spending a longer than necessary time on the scene. Defendants presented expert evidence that Dodson and Lill complied with the applicable standard of care.
Consideration of four factors is helpful to our determination of whether defendants violated the duty owed: (1) likelihood of the harm; (2) gravity of the harm; (3) burden of prevention; and (4) social utility of the defendants' conduct. As to the first factor, we find that the likelihood was great that the decedent might lose a chance of survival because of the EMTs delay in getting him to the hospital, and their making him exert himself by walking to the stretcher. The gravity of the possible harm was obviously great.
The burden of prevention, having the EMTs proceed with all due speed and not delay does not appear that great. Insofar as getting the decedent to the stretcher by means other than walking him, defendants could have used a stair chair or possibly have gotten the stretcher closer to him. The social utility of the EMTs trying to stabilize the decedent and get him to the hospital was unquestionably great and the reason the legislature has provided the qualified immunity under R.S. 40:1235(A).
Considering the evidence as a whole, and the balancing factors discussed above, the finding by the jury that the acts and/or omissions of Dodson and Lill were grossly negligent, i.e., that they showed "the want of even slight care and diligence," "amounting to complete neglect of the rights of others," was supported by the evidence and was not clearly wrong.

(4) Scope of the duty owed:

We now examine whether the risk of the decedent losing a chance of survival was encompassed within the scope of the duty owed him by the EMTs. It is entirely foreseeable that the loss of a chance of survival will follow from a breach of the duty of ordinary care owed by an EMT to a patient suffering from symptoms of cardiac arrest. The ease of association factor is great and overwhelmingly militates in favor of an answer in the affirmative. See Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903, 907 (1976).
Our finding as to this assignment of error renders moot consideration of whether the *244 trial court erred in failing to direct a verdict as to defendants' negligence.

PROPORTIONATE DAMAGES
Defendants argue that, in a case such as this, where plaintiffs only have to prove there would have been a chance of survival but for the defendants acts or omissions, plaintiffs should be entitled to recover only damages "equal to the percent of the chance of survival lost due to the negligence multiplied by the total amount of damages that are ordinarily allowed in a wrongful death action." Defendants cite two out-of-state cases in support of their position but present no argument as to that assignment of error.[2] However, we will consider it briefed and address it.[3]
Defendants cite no Louisiana cases in support of their position, nor can we find any. To the contrary, both state and federal courts in Louisiana award full damages in such "loss of chance" cases. In Hampton v. Greenfield, supra, this court considered the amount of total damages awarded for lost chance of survival without regard to any reduction to a percentage equal to a quantified lost chance of survival.
In Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990), reversing a lower court decision, the Louisiana Supreme Court awarded damages to the parents of their son who committed suicide after being wrongly diagnosed as a non-emergency case not requiring immediate hospitalization. The damages were reduced only by the percentage of comparative fault assessed to the parents.
In Ruff v. Bossier Medical Center, 952 F.2d 138 (5th Cir.1992), the court affirmed an award of damages to the family and estate of a decedent who suffered a heart attack but was initially diagnosed as suffering complications from diabetes and osteoarthritis. Although liability was based on the decedent's lost chance of survival, the court did not discuss reducing total damages to a percentage equal to the chance lost.
We decline to reduce the award of damages in this case to correlate to the speculative quantified chance of survival.

SURVIVAL DAMAGES
Defendants claim the trial court erred in awarding $115,000.00 in damages to the estate of the decedent for his pain and suffering prior to his death. Damages for pain and suffering are properly awarded if there is the slightest amount, or scintilla, of evidence of pain and suffering on the part of the deceased. Cannon v. Cavalier Corporation, 572 So.2d 299 (La.App. 2d Cir.1990); Cupstid v. Harrison Hardwood Manufacturing Co., 552 So.2d 1223 (La.App. 3rd Cir. 1989), writs denied, 558 So.2d 572 (La.1990); Pierre v. Lallie Kemp Charity Hospital, 515 So.2d 614 (La.App. 1st Cir.1987), writ denied, 515 So.2d 1111 (La.1987). See also, Temple v. Liberty Mutual Insurance Co., 330 So.2d 891 (La.1976). Pain and suffering can be evidenced by the actions of the deceased or otherwise. Temple v. Liberty Mutual Insurance Co., supra; Cannon v. Cavalier Corporation, supra. The compensable period of pain and suffering is between the occurrence of the injury to the moment of death. Owens v. Martin, 430 So.2d 1248 (La.App. 1st Cir. 1983); Temple v. Liberty Mutual Insurance Co., supra.
There was no evidence submitted at trial that the decedent experienced any pain and suffering after he stopped breathing as he was being loaded onto the ambulance. Therefore, no award could have been made for that period. There was evidence indicating that the decedent experienced both physical pain and suffering while he waited for the EMTs to transport him to the hospital. Because there was expert testimony establishing that there was an unnecessary delay in getting the decedent to the hospital, where he presumably would have gotten some type of relief, some of that period of pain and suffering must be attributable to defendants. *245 In addition, although there was no direct testimony to this effect, the jury could have reasonably inferred that walking the decedent to the stretcher instead of bringing the stretcher to the decedent, caused him additional pain and suffering. Of course, the primary cause of the pain and suffering was his heart condition which was not attributable to defendants. The evidence indicates also that the decedent suffered some mental anguish because of the delay in getting him moving to the hospital. He begged to be taken to the hospital.
Having determined that some damages were due for the decedent's pain and suffering, we now consider whether these damages, like any other general damages, were so excessive as to constitute a clear abuse of discretion. Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226 (La. App. 4th Cir.1991), writs denied, 592 So.2d 1299, 1300 (La.1992).
Considering that most of the decedent's pain and suffering was not attributable to defendants, we believe the award of $115,000.00 was a clear abuse of discretion. We will reduce the award to $75,000.00, the highest amount we believe the jury could have awarded. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Reck v. Stevens, 373 So.2d 498 (La.1979); Burton v. Berthelot, 567 So.2d 649 (La.App. 4th Cir.1990), writ denied, 569 So.2d 989 (La.1990). We will amend the judgment accordingly.
Our disposition of this assignment of error renders moot consideration of defendants assignment of error regarding the trial court action in failing to grant a remittitur for this element of damages.

DIRECTED VERDICT AS TO WARREN AMBROSE
At the close of plaintiffs case defendants moved for and were granted a directed verdict as to the decedent's son, Warren Ambrose. Warren Ambrose did not attend or testify at trial. He resided out of state. The trial court found that there had been no testimony at all concerning the relationship between the decedent and his son and, thus, nothing for the jury to consider. The trial court stated that any award would be based on speculation as to the relationship and would therefore be erroneous.
Motions for directed verdicts are authorized by La.C.C.P. art. 1810. The standard for directing a verdict was set out by this court in Verdun v. State, Through Dept. of Health and Human Resources, 598 So.2d 1091 (La.App. 4th Cir.1992), writ denied, 604 So.2d 1003 (La.1992), where we stated:
A motion for a directed verdict is properly granted in a jury trial when it is clear that the facts and inferences point so strongly and overwhelmingly in favor of the mover that reasonable minds could not reach a different verdict. In determining whether to grant a motion for directed verdict, the trial judge must consider the evidence in the light most favorable to the mover's opponent. Armstrong v. Lorino, 580 So.2d 528, 533 (La.App. 4th Cir.1991), writ denied, 584 So.2d 1166 (La.1991).
When reviewing a trial court's granting or denial of a motion for directed verdict the appellate court should determine whether, considering all of the evidence, reasonable people could have reached a contrary verdict. Bergeron v. Blake Drilling & Workover Co., Inc., 599 So.2d 827 (La.App. 1st Cir.1992), writs denied, 605 So.2d 1117, 1119 (La.1992).
In the instant case, there was testimony from other family members concerning, in a very general way, the familial relationship between all of the family members. For instance, plaintiffs cite a portion of Linda Thomas's testimony when she answered in the affirmative when asked if she, her sister and her brother were close. Mrs. Ambrose testified, without naming any of the children, that the decedent always wanted the children and grandchildren to come over to their house for Christmas dinner. Gail Ray stated that they were all a close family. Plaintiffs admit that no specific testimony was presented at trial concerning the "intimate personal details" of the relationship between Warren Ambrose and his father.
Plaintiffs point to Comberrel v. Basford, 550 So.2d 1356 (La.App. 5th Cir.1989), writs denied, 556 So.2d 1284, 1285, 1286 (La.1990) wherein the court cited "the uncontradicted evidence of a strong, loving family" in affirming *246 an award of damages for "such intangibles as grief, loss of love and affection, and loss of companionship." Id. at 1362.
Considering all of the evidence, we believe reasonable people could have found evidence, however minimal it may have been, that Warren Ambrose suffered some measure of grief and loss of love and affection.
Considering that the decedent's two daughters who lived nearby and who testified were awarded $25,000.00 each for their grief and loss of love, affection and companionship, we will award Warren Ambrose $12,500.00 for his loss.
For the foregoing reasons, we amend the judgment of the trial court to reduce the amount of damages for the decedent's pain and suffering from $115,000.00 to $75,000.00. We reverse the granting of the directed verdict as to Warren Ambrose, and amend the judgment to award him $12,500.00. The total judgment in favor of plaintiffs is thereby reduced to $612,500.00 plus legal interest from the date of judicial demand, costs and expert witness fees for plaintiffs' experts as assessed by the trial court. We affirm the judgment of the trial court in all other respects and as amended.
REVERSED IN PART; AMENDED; AFFIRMED AS AMENDED.
JONES, J., concurs.
NOTES
[1] The jury verdict in favor of the plaintiffs was unanimous.
[2] Perez v. Las Vegas Medical Center, 107 Nev. 1, 805 P.2d 589 (1991); Herskovits v. Group Health Cooperative of Puget Sound, 99 Wash.2d 609, 664 P.2d 474 (1983).
[3] Plaintiffs cite rule 2-12.4 of the Uniform Rules for the Courts of Appeals which gives an appellate court the discretion to consider as abandoned any assignment of error "which has not been briefed."