715 So.2d 69 (1998)
Brenda Lewis DECLOUET, et al.
v.
ORLEANS PARISH SCHOOL BOARD, et al.
No. 96-CA-2805.
Court of Appeal of Louisiana, Fourth Circuit.
June 3, 1998.
Rehearing Denied June 30, 1998.
*71 Michele Gaudin, Salvador G. Longoria, Gaudin & Longoria, New Orleans, and James L. Trinchard, Clare W. Trinchard, Leigh Ann Schell, Trinchard & Trinchard, New Orleans, for Plaintiff-Appellant.
Clare Jupiter, Bryan & Jupiter, New Orleans, for Defendant-Appellant.
Terry J. Freiberger, Brett A. North, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for Defendant-Appellant Indemnity Insurance of America.
B. Ralph Bailey, Frederick H.N. Dwyer, Scott O. Gaspard, Bailey & Dwyer, Mandeville, for Defendant-Appellant Oliver Vital.
Ernest L. O'Bannon, David M. Melancon, Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for Defendants/Appellants.
Before SCHOTT, C.J., and BARRY and MURRAY, JJ.
*72 BARRY, Judge.
Catrina Lewis died from an asthma attack at school on March 21, 1991. Her mother and sisters sued, inter alia, the school's acting principal, a school counselor, their insurers, the Orleans Parish School Board, and the Superintendent of New Orleans Public Schools.[1] The trial court awarded total damages of $1,172,661.09. The issues are liability, quantum, insurance coverage and subrogation.
We affirm liability. However, the trial court's apportionment of fault was manifestly erroneous, and we amend the allocation of fault. The award for survival damages was excessive. Therefore, we amend that award and affirm as amended. We affirm the awards to Catrina's mother, Ms. Declouet, and two sisters, Rochshell and Lashaster Lewis, for mental pain and suffering due to witnessing Catrina at the time of her fatal attack. The evidence does not support the award to Catrina's sister, Ashanti Declouet, for mental pain and suffering and we vacate that award. We also vacate the awards for past and future medical expenses of Ms. Declouet, Rochshell and Lashaster Lewis, and Ashanti Declouet. The judgment in favor of the acting principal, Olivar Vital, against his insurer, Scottsdale Insurance Company, and denial of the cross claim by Vital and Scottsdale for indemnity against the School Board, are affirmed. The judgment in favor of the counselor, David Freeman, for indemnity against the School Board, is affirmed. Freeman's insurer, Indemnity Insurance Company of North America, is subrogated to Freeman's right of indemnity against the School Board. Therefore, we reverse the judgment denying IINA's cross claim and render judgment in favor of IINA for indemnity against the School Board.

Facts
Catrina Lewis, a senior at Alfred Lawless Senior High School, was in the school auditorium for a teachers' talent show when she began experiencing an asthma attack. Catrina and her sister Lashaster (in eighth grade) left the auditorium and asked security guard Daniel Baptiste to call 9-1-1 because Catrina was having difficulty breathing. Catrina did not appear to be in severe distress. The trial court found the time to be about 2:00-2:05 p.m.
Using a walkie-talkie Baptiste called acting principal Olivar Vital who was elsewhere on campus.[2] According to Lashaster, Baptiste told Vital a student was sick and needed to call 9-1-1. Lashaster and Baptiste testified Vital instructed Baptiste to call Catrina's parents first.[3] Vital acknowledged that he told Baptiste to call the parents but denied that was necessary before calling 9-1-1.
Baptiste guided Catrina and Lashaster to the school office about a block from the auditorium. The walk took five to ten minutes and aggravated Catrina's condition.
David Freeman, Catrina's school counselor, was in the office.[4] Though he denied that Catrina was in distress when she entered, Freeman said Lashaster and Baptiste were helping her walk and she was "bowed over and had her hand over her face." Lashaster testified she immediately told Freeman to call 9-1-1 because Catrina was having an asthma attack. Freeman told Lashaster to call her mother to see if she would pay for the ambulance and he refused Lashaster's pleas to call 9-1-1. She could not immediately get an outside line because someone was on the phone then unsuccessfully attempted to contact her mother. Catrina's condition deteriorated. Freeman fanned Catrina and attempted to assist her with her ventolin pump. He took her outside for fresh air. Catrina told Lashaster she was "not going to make it" and Lashaster called 9-1-1 at 2:34 p.m. Vital arrived in the office. Lashaster again called 9-1-1 at 2:43 p.m. Catrina lost consciousness. Baptiste called 9-1-1 a third time at 2:44 p.m. During that *73 call the school nurse advised E.M.S. personnel that Catrina was in respiratory arrest and was not alert.
Catrina's mother, Brenda Lewis Declouet, was across the street at Lawless Elementary School to pick up her younger daughter, Ashanti. Baptiste walked to Lawless Elementary and informed Ms. Declouet that Catrina was having an asthma attack. When Ms. Declouet reached the office she saw Catrina unconscious and being cared for by Freeman and the school nurse.
Ashanti got out of school about 2:35 p.m. Her friend directed her across the street where Ashanti found her mother and saw Catrina unconscious. Lashaster summoned their sister Rochshell (a sophomore), who saw Catrina unconscious as the nurse attempted CPR.
The ambulance arrived about 2:48 p.m. Ms. Declouet rode with Catrina in the ambulance. The technicians could not revive Catrina and she was pronounced dead shortly after arriving at the hospital.
Dr. Everett Williams, former Superintendent of Public Schools in Orleans Parish, testified that under the School Board's medical treatment policy the principal is responsible for ensuring that a sick or injured student receives medical attention in an emergency. He said that if Vital and Freeman were informed that a 9-1-1 call was necessary, each had the responsibility of ensuring that call was made. Dr. Williams said anyone has authority to call 9-1-1 in an emergency.
Testimony conflicted concerning whether Freeman was aware of Catrina's asthma before this incident. Ms. Declouet testified that Catrina had been hospitalized and missed school due to asthma in October 1988 and in January 1989. Each time Ms. Declouet said she informed Freeman and others of Catrina's condition. Rochshell testified that she and Freeman previously discussed Catrina's asthma. Lashaster and Catrina's friends said Catrina frequently missed school to attend a weekly asthma clinic and took written doctor's excuses to the school office. Absence and permission slips were not in Catrina's files, although one file contained two notations of Catrina's illness in February 1986. Freeman denied that Ms. Declouet and Rochshell informed him of Catrina's illness and past hospitalization.
Psychologist Edward Shwery, Ph.D., saw Ms. Declouet, Lashaster, Rochshell and Ashanti within a month after Catrina's death, and treatment continued until trial. He testified that Ms. Declouet was devastated and suffers clinical depression ("traumatic chronic depression"), as distinguished from normal grief over a loved one. She has withdrawn from social settings and she has difficulty sleeping. He said Ms. Declouet's psychological coping skills are "limited." Costs for 92 visits from 1991 to 1996 totalled $14,683.67.
Dr. Shwery testified that Lashaster has very poor coping skills. She suffers depression and has at times been dysfunctional. The cost of 102 visits over five years totalled $15,518.93.
Rochshell testified she experienced headaches and insomnia after Catrina's death and she expressed great sadness over losing her sister. Dr. Shwery said Rochshell had difficulty concentrating on her duties as a mother for about six months after Catrina's death. She "has an undercurrent of depression" and experiences grief. The cost of 83 visits over five years was $13,635.68.
Ashanti testified that she suffered headaches, back and neck pain and insomnia after Catrina died. Dr. Shwery said Ashanti has grieved, experienced bad dreams, felt depressed at times, but she has adapted. The cost of 48 visits for five years totalled $9,912.08.
Dr. Shwery said Ms. Declouet, Lashaster, Rochshell and Ashanti will need two or three years of additional psychological treatment. He estimated the total cost of future treatment at $70,000 and said an additional $30,000 of treatment was "possible."
William Sherar was an expert in insurance and underwriting. He examined the insurance policy issued by the Indemnity Insurance Company of North America to the American Federation of Teachers, in effect March 1991. Sherar opined the policy provided primary coverage because it stated in *74 Section IV that it was excess over any self-insurance program covering the insured and the school board did not insure its teachers.
Sherar examined the insurance policy issued by Scottsdale Insurance Company insuring the Louisiana Association of School Executives. That policy stated it was excess over any other collectible insurance, including self-insurance. Sherar opined that the Scottsdale policy was primary for the named insured (school board executives) absent other valid and collectible insurance, though he deferred to the court whether Vital as vice principal was insured by the Scottsdale policy.
James Henderson, Chief Financial Officer for the School Board, testified that the Orleans Parish School Board maintains self-insurance that includes liability and group health. Henderson said the self-insurance does not cover teachers, administrators and principals individually. However, the self-insurance covers the School Board for liability due to an employee's action.
After a bench trial the trial court rendered judgment for plaintiffs against the Orleans Parish School Board and its superintendent Everett Williams, Vital and his insurer Scottsdale Insurance Company, and Freeman and his insurer Indemnity Insurance Company of North America (IINA). The court apportioned fault 20% to the Orleans Parish School Board, 50% to Vital, and 30% to Freeman.
The court awarded damages:

Catrina's pre-death pain and suffering
 (survival action by Ms. Declouet) $ 500,000.00
Loss of Catrina
 (Ms. Declouet's wrongful death claim) $ 350,000.00
Lejeune damages:
 Ms. Declouet $ 50,000.00
 Lashaster $ 75,000.00
 Rochshell $ 25,000.00
 Ashanti $ 25,000.00
Past medical expenses:
 Ms. Declouet $ 22,947.67
 Lashaster $ 15,906.93
 Rochshell $ 14,058.68
 Ashanti $ 10,315.08
Future medical expenses:
 Ms. Declouet $ 50,000.00
 Lashaster $ 10,000.00
 Rochshell $ 10,000.00
 Ashanti $ 10,000.00
Funeral Expenses $ 1,519.50
Emergency Medical Services $ 664.00
Prescriptions $ 2,249.23
 _____________
 TOTAL $1,172,661.09

The court awarded costs and interest from the date of demand until paid.
The trial court granted judgment in favor of Vital against Scottsdale Insurance Company for his liability, and in favor of Freeman against IINA for his liability. The court denied cross claims for indemnity by Vital, Scottsdale Insurance Company and IINA against the School Board.
Vital, Scottsdale, Freeman and IINA appealed. Freeman dismissed his appeal.
Vital argues the trial court erred by finding liability and causation; the trial court applied the wrong standard of care; the apportionment of fault was manifestly erroneous; he was prejudiced by a conflict of interest due to his counsel's dual representation of Vital and the School Board; he is entitled to indemnity against the School Board; and quantum is excessive.
Scottsdale argues the trial court erred by finding Vital 50% at fault; denying Vital and Scottsdale indemnification from the School Board; and quantum. Additionally, Scottsdale argues the insurance policy issued to Vital was excess over the School Board's self-insurance or indemnity benefit program.
IINA submits it is subrogated to Freeman's rights against the School Board.

Fault of Vital
Vital and Scottsdale argue that Vital was not at fault because he acted reasonably and complied with School Board procedure. The trial court's reasons state that Vital did not ascertain the sick student's identity or condition, did not ensure that 9-1-1 was promptly called, and his failure to act "promptly and responsibly" caused Catrina's death. We have no basis to disturb that ruling.
The standard of care for a school teacher and administrator is that of a reasonable person under similar circumstances. Morris v. Orleans Parish School Board, 553 So.2d 427, 429 (La.1989); DeGruy v. Orleans Parish School Board, 573 So.2d 1188, 1191 (La.App. 4th Cir.1991).
The School Board's medical emergency policy in 1991 as to accidents and injury provided:

*75 In the event a student is injured during school hours on the school premises, it is the principal's responsibility to contact the parent or guardian listed on the student's emergency information card on file. If the parent cannot be contacted, the student may be taken directly to his/her family physician or provided with emergency first aid (i.e., care which will protect the life and comfort of a student until authorized treatment is secured) by school personnel.
The principal was absent and Vital was acting principal. Although Catrina was sick rather than injured, the medical emergency policy sets forth an analogous responsibility owed by Vital.
Vital said he did not know Catrina was in a life-threatening situation and argues he acted reasonably by deferring to Baptiste and other personnel to determine whether to call 9-1-1. Baptiste advised Vital that a student was sick and they needed to call 9-1-1. That was sufficient to apprise Vital that a student had a medical emergency. At that point School Board policy required Vital to ensure that Catrina's parents were called and emergency medical assistance was forthcoming.
Though Vital thought Baptiste called him from the school office and was near a phone, he did not confirm Baptiste's location and did not seek further information about Catrina's condition. He instructed Baptiste to call or to have office personnel call Catrina's parent. Lashaster and Baptiste understood Vital's instruction to call Catrina's parent for permission before calling 9-1-1; Vital explained that he meant the school had to notify the parent about the call to 9-1-1. In response to Vital's instruction, Baptiste walked Catrina to the office. That walk delayed the call to 9-1-1 and exacerbated her condition.
Vital testified that he and Baptiste were in constant contact on the walkie-talkie. However, Vital's lack of knowledge concerning Baptiste's whereabouts and the urgency of Catrina's condition belies that claim. Because Vital did nothing to ensure that Catrina received prompt medical attention, the trial court's finding that Vital breached the duty to Catrina was not manifestly erroneous.

Causation
Vital argues that his actions did not cause Catrina's death because only nine minutes passed from the time he was informed of the emergency and Catrina's death. He submits the trial court erred by finding that the events unfolded between 2:05 and 2:45 p.m. That claim has no merit.
Testimony conflicted concerning the time and duration of Catrina's asthma attack and the arrival of the ambulance. Vital said Baptiste notified him on the walkie-talkie after 2:20 p.m. Freeman said Baptiste, Lashaster and Catrina entered the office about 2:30 p.m.
Lashaster said she and Catrina left the auditorium about 2:05 p.m. Rochshell testified that midway through the talent show, Lashaster ran back to the auditorium, got Rochshell, and led her to the office where Catrina was unconscious. Catrina's friend, Leslie Andrews, a student in the auditorium, testified that she went to the front of the auditorium about 2:00 p.m. for a better view and she did not see Catrina after that. About 2:25 p.m. Andrews saw Lashaster walking briskly through the auditorium. Andrews followed Lashaster to the office where Ms. Declouet had arrived. Another student, Kewa Kaufman, testified that Andrews went to the front of the auditorium shortly after 1:50 p.m. Just after that, Catrina went to the bathroom for two to three minutes then left with Lashaster.
The trial court concluded that Catrina and Lashaster left the auditorium and Baptiste called Vital between 2:00 and 2:05 p.m. The record clearly supports that time frame.
Dr. Jan Maroney Sayem El Dahr, expert in pediatric allergy and immunology and Catrina's treating physician in 1991, testified that asthma is the reversible obstruction of the lungs. In her opinion Catrina probably would have survived had she received medical treatment before she lost consciousness. Catrina was conscious when Lashaster made the first 9-1-1 call at 2:34 p.m.
Testimony established that emergency medical vehicles were available between 2:00 and 2:40 p.m. the day Catrina died. Investigator *76 Robert Heindel testified that it took seven minutes and 41 seconds to travel two and a half miles from Lawless High School to United Medical Center on a Friday afternoon at 2:18 p.m. He said it took eleven minutes and 41 seconds to travel over four miles to De La Ronde Hospital on a Monday at 2:35 p.m.
Thus, Vital had at least thirty minutes after the call from Baptiste to ensure medical assistance was provided for Catrina. His failure to do so was a cause-in-fact of Catrina's death.
In a related argument Vital asserts that causation was wrongly based on the doctrine of "lost chance of survival" which applies to a medical malpractice case. That argument is based on a misreading of the trial court's reasons and has no merit.
Plaintiffs established that it is critical to obtain prompt medical attention for an acute asthma attack. The trial court considered Dr. El Dahr's testimony that until Catrina lost consciousness between 2:38 and 2:40 p.m. she had a 99% chance of survival with medical treatment. The statistic cited by the trial court simply stressed that Catrina probably would have survived had Vital not breached the standard of care and thus supported causation. The trial court's finding of causation was not manifestly erroneous.

Apportionment of Fault
Vital and Scottsdale argue the trial court erred by allocating 50% fault to Vital. He submits the greater portion of fault is attributable to Freeman who saw Catrina in distress and to the School Board because the Board did not train its employees on how to deal with a medical emergency.
Apportionment of fault is a factual issue and should not be disturbed absent manifest error. Davis v. Housing Authority of New Orleans, 93-0566 (La.App. 4 Cir. 2/25/94), 633 So.2d 810, 814. To determine the degree of fault, the court should consider the causal relationship between the conduct and the damage, and the nature of the parties' conduct as determined by factors including: 1) whether the conduct resulted from inadvertence; 2) magnitude of the risk created by the conduct; 3) the significance of the intended result of the conduct; 4) the relative capacities of the actors; and 5) extenuating circumstances requiring haste. Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967, 974 (La.1985); Davis v. Housing Authority of New Orleans, 633 So.2d at 813-814.
When we consider the nature of the parties' conduct we readily conclude that the trial court erred by apportioning greater fault to Vital than to Freeman. Freeman's failure to reasonably respond to Catrina's obvious distress created an immediate and fatal risk. Though Freeman acted in accordance with his misguided understanding of school policy, the intended result of his order to obtain Ms. Declouet's permission before calling 9-1-1 carried negligible significance when weighed against the risk of Catrina's life. Freeman's culpability arose when he ignored the dire pleas of the child to call 9-1-1 for her sister who gasped for air through labored breathing in Freeman's presence.
If Vital would have followed through on the bulletin from Baptiste, someone would have immediately called 9-1-1 and Catrina probably would have survived. Although Vital did not personally observe Catrina's affliction, he was in a position of authority but failed to secure that prompt medical attention for Catrina. Given the relative capacities of the parties and the relative immediacy presented to each, we conclude that a greater percentage of fault should have been apportioned to Freeman. We assign 50% fault to Freeman, 30% to Vital, and we affirm the 20% fault to the School Board.

Conflict of Interest
Vital complains that the same attorney represented him and the School Board. He argues there was a conflict of interest and urges this Court to grant a new trial. That assignment has no merit.
Plaintiffs' original petition named as a defendant the Orleans Parish School Board and alleged that the Board failed to properly train school personnel to handle a medical emergency. Plaintiffs' First Supplemental and Amending Petition, filed March 20, 1992, named as defendants Vital and his liability insurer "GHI Insurance Company, a fictitious *77 name used to represent an actual insurance company." It alleged, inter alia, that Vital failed to adopt and follow a plan to identify a high risk student and failed to implement a plan for contacting a sick student's parents in a medical emergency.
On March 31, 1992 counsel for the School Board, Clare Jupiter, sent Vital a letter ensuring him: "(T)he School Board will defend you vigorously, and in the unfortunate event that a judgment is rendered against you, it will pay the said judgment fully." Jupiter filed a general denial on behalf of the School Board, Vital and other Board employees on August 11, 1992.
On October 22, 1993 Jupiter filed on Vital's behalf a Third Party Demand against Scottsdale Insurance Company for indemnity in the event Vital was held liable. Fifteen months later, on January 9, 1995, plaintiffs filed a Third Supplemental and Amending Petition substituting Scottsdale for GHI Insurance Company.
On August 17, 1995 counsel for Scottsdale, B. Ralph Bailey, filed on behalf of Vital and Scottsdale an Answer to plaintiffs' Third Supplemental and Amending Petition and a Third Party Demand against the School Board for indemnity.[5] On September 9, 1995 Jupiter filed on behalf of the School Board a Motion for Summary Judgment to dismiss Vital's Third Party Demand. Three weeks later Jupiter withdrew that motion and moved to strike Vital's Third Party Demand against the School Board because Bailey and Scottsdale had no authority to represent Vital.
In the interim, on September 8, 1995, Vital and Scottsdale moved to disqualify Jupiter based on a conflict of interest presented by her representation of the School Board and Vital. Correspondence attached to that motion shows that the trial court considered the alleged conflict in a status conference in chambers on June 21, 1995. A hearing was held on September 29, 1995 after which the trial court implicitly found that Jupiter's dual representation of the School Board and Vital presented a conflict of interest. An October 10, 1995 judgment ordered:
Scottsdale Insurance Company will unconditionally assume the defense of Oliver Vital regardless of any future determination that the Scottsdale policy provides excess or primary coverage;
Clare Jupiter's representation of Oliver Vital will be limited to preserving the rights of Oliver Vital under the policy of insurance issued by Scottsdale Insurance Company.
Trial was held January 29, 1996 through February 1, 1996.
Vital argues he is entitled to a new trial because he was prejudiced when Jupiter took the following actions adverse to his interests: 1) Jupiter sought indemnity against Scottsdale without consulting him; 2) Jupiter filed a motion for summary judgment to dismiss the Third Party Demand that Vital and Scottsdale filed against the School Board; though she dismissed that motion, Jupiter moved to strike Vital's Third Party Demand; 3) a School Board employee provided an affidavit in support of plaintiffs' motion for summary judgment seeking declaratory judgment that the Scottsdale policy provided primary coverage (the trial court denied that motion); 4) Jupiter did not raise the defense that Vital was not properly trained by the School Board concerning medical emergencies; 5) Jupiter did not present expert testimony to contradict Dr. El Dahr; and 6) the School Board Superintendent testified against Vital.
Pleadings which Jupiter filed on the School Board's behalf against Vital demonstrate the conflict which the trial court implicitly found. However, Vital was not deprived of a defense. At trial, Scottsdale pursued Vital's claim that the School Board did not adequately train him on emergency procedure. The trial court held the School Board liable, apportioned 20% fault, and stated that the School Board provided inadequate training.[6] *78 Though the Superintendent of Schools testified against Vital, that testimony was presented at trial when Scottsdale represented Vital. Vital complains that the School Board did not call an expert to contradict Dr. El Dahr. However, Vital did not disclose the content of the alleged contradictory testimony and did not provide a proffer.
Vital alleges that Jupiter filed the third party petition seeking indemnity against Scottsdale without his consent. Jupiter denies that Vital did not consent, and there is no evidence that Vital was not consulted.
The record does not show prejudice and there is no basis for a new trial.

Survival Damages
Vital and Scottsdale argue the trial court abused its discretion by awarding $500,000 for Catrina's pre-death pain and suffering. They argue that Catrina's asthma attack would have occurred and she would have experienced pain and suffering regardless of Vital's actions. They further contend the award was excessive and punitive.
The right to recover damages for pre-death injury to Catrina survived in favor of Ms. Declouet because Catrina did not have children. La. C.C. art. 2315.1(A)(2). Survival damages are properly awarded if there is any evidence ("a scintilla") of pain or suffering on the part of the decedent. In re Medical Review Panel Bilello, 621 So.2d 6, 9 (La.App. 4th Cir.), writ den. 629 So.2d 1139 (La.1993). Fright, fear and mental anguish during the ordeal are compensable. Id.
The trial court found that Catrina "consciously suffered and was in pain and terror for almost thirty-four minutes." While that is true, we must acknowledge that the asthma attack and at least some of Catrina's pain and suffering would have occurred had there been no delay. If 9-1-1 had been called between 2:00 and 2:05 when Baptiste notified Vital on the walkie-talkie, it would have taken a few minutes for the ambulance to arrive and several minutes to reach a hospital. Based on Dr. El Dahr's description of an asthma attack, Catrina would have suffered during that time.
In Ambrose v. New Orleans Police Department Ambulance Service, 627 So.2d 233 (La. App. 4th Cir.1993), rev'd on other grounds, 93-3099 (La.7/5/94), 639 So.2d 216, this Court reduced survival damages against the City and its emergency medical technicians who delayed for twenty minutes getting the decedent to a hospital and aggravated his condition by making him walk to the stretcher. He died of cardiac arrest. This Court held that the jury properly awarded damages for pain and suffering caused by walking the decedent to the stretcher, ignoring decedent's plea to go and delaying transport to the hospital. However,
Considering that most of the decedent's pain and suffering was not attributable to defendants, we believe the award ... was a clear abuse of discretion.
Ambrose, 627 So.2d at 245. This Court reduced the award.
Therefore it was improper to attribute all of Catrina's pain and suffering to Vital. Because the trial court erred by imputing the entirety of Catrina's pain and suffering to the defendants, the award of $500,000 based upon that finding was excessive.
Having determined that the award was excessive, we look to prior awards to determine the highest that is reasonably within the trial court's discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Warner v. City of New Orleans, 96-1296, p. 6 (La.App. 4 Cir. 5/30/97), 694 So.2d 1231, 1233, writ den. 97-2037 (La.11/14/97), 703 So.2d 626, setting forth the appellate standard of review for a general damage award.
In Ambrose v. New Orleans Police Department Ambulance Service, 627 So.2d at 245, the jury awarded $115,000 for survival damages and this Court reduced the award to $75,000 for pain and distress suffered by the decedent during a twenty minute medical delay.
This Court affirmed a $125,000 award for twenty-four hours of pain and suffering by a fourteen year old boy following cardiac surgery. *79 In re Medical Review Panel Bilello, 621 So.2d at 12. During that time the decedent experienced acute respiratory distress, felt weak and "freezing," and was terrified because he thought death was imminent.
The First Circuit affirmed an $85,000 survival damage award where a sixteen year old Japanese exchange student was shot to death by a homeowner and survived for thirty minutes. Hattori v. Peairs, 95-0144, p. 15 (La.App. 1 Cir. 10/6/95), 662 So.2d 509, 518, writ den. 95-2677 (La.1/12/96), 666 So.2d 322. The boy suffered immensely, "moaning, groaning, thrashing ...," in agony and "fighting to stay alive."
In Easton v. Chevron Industries, Inc., 602 So.2d 1032 (La.App. 4th Cir.), writs den. 604 So.2d 1315, 1316 (La.1992) the decedent was conscious for two hours after being crushed by a crane which fell on him. Pain medication was not administered because it would have decreased his chance of survival. Decedent's awareness of his circumstances generated acute mental distress. This Court affirmed an award of $100,000.
Two maritime cases involved substantial survival damage awards, one for thirty minutes and one for nearly nine hours of pre-death pain and suffering.
In Strawder v. Zapata Haynie Corp., 94-453, 94-454 (La.App. 3 Cir. 11/2/94), 649 So.2d 554, 559, the victims experienced an explosion and fire on a ship. For twenty to thirty minutes their skin blistered due to intense heat and they inhaled sea water and sea shells. A $500,000 award was affirmed.
This Court affirmed a $350,000 award for decedent's pain, suffering, and distress after he was crushed by a device used to secure a barge. Osorio v. Waterman Steamship Corp., 557 So.2d 999, 1011 (La.App. 4th Cir.), writs den. 561 So.2d 99 (La.1990). Decedent survived for nearly nine hours and did not receive sufficient pain medication.
In assessing the award for Catrina's pre-death pain and suffering we are mindful that Catrina was keenly aware of the severity of her asthma and resolutely attentive to her medical needs. The defendants' seeming indifference to Lashaster's pleas to call 9-1-1 certainly intensified Catrina's anxiety, aggravated her asthma, and increased her suffering. Based on prior awards and considering that Catrina would have endured some pain and suffering had there been no delay in treatment, we conclude that $250,000 is the highest award which can reasonably be assessed.

Lejeune Damages
Vital and Scottsdale argue that Ms. Declouet, Rochshell, and Ashanti are not entitled to damages for mental anguish caused by viewing Catrina in an unconscious state. Alternatively, the award to all plaintiffs was excessive. The trial court awarded $50,000 to Ms. Declouet, $75,000 to Lashaster, and $25,000 each to Rochshell and Ashanti.
Mental pain and anguish sustained by a person not directly injured, because of negligent infliction of injury on a third person, is recoverable within enumerated restrictions. Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). La. C.C. art. 2315.6 was added by Acts 1991, No. 782 § 1 and codifies Lejeune.[7] The claimant must show: 1) she either viewed the accident or injury-causing event or came upon the accident scene soon thereafter and before substantial change occurred in the victim's condition; 2) the "direct" victim of the traumatic injury suffered such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience; 3) the plaintiff's emotional distress was reasonably foreseeable and "both severe and debilitating;" and 4) the plaintiff shared a close relationship to the injured person such that the plaintiff's shock was understandable. Lejeune, 556 So.2d at 570.
Vital and Scottsdale argue that Ms. Declouet, Rochshell and Ashanti are not entitled to damages because they arrived after Catrina lost consciousness and they did not witness her asthma attack. That argument has no merit.
The plaintiff in Lejeune entered her husband's hospital room and discovered that his body and face had multiple rat bites which *80 apparently were inflicted a short time before. Mr. Lejeune was comatose when the incident occurred. Mrs. Lejeune did not witness the injury-causing event (rat bites) and did not see her husband suffer. However, damages were recoverable because she came upon the scene soon thereafter and saw the traumatic injury. That Ms. Declouet, Rochshell, and Ashanti did not witness Catrina's asthma attack does not defeat their claims for mental anguish. Lejeune, supra. They came upon the scene within minutes of the attack and saw Catrina unconscious from the asthma.
Vital and Scottsdale argue that Ashanti's emotional distress did not meet the level required in Lejeune. That argument has merit.
Lejeune requires that the claimant's emotional distress be severe and debilitating, such as "neuroses, psychoses, chronic depression, phobia and shock." Lejeune, 556 So.2d at 570. However, plaintiff need not present proof of a clinical diagnosis. Blair v. Tynes, 621 So.2d 591, 601 (La.1993), reh. granted on other grounds, 625 So.2d 1346 (La.1993). The reasonable person standard applies to determine whether emotional distress supports recovery. Blair, 621 So.2d at 600; Lejeune, 556 So.2d at 570. See La. C.C. art. 2315.6.
Ashanti testified that she experienced aches and insomnia after Catrina died. Dr. Shwery said Ashanti had bad dreams and occasionally felt depressed. Though Ashanti grieved over the loss of her sister, there is no evidence that she was debilitated and unable to function. Dr. Shwery testified that Ashanti has relatively good coping skills and has adapted well. Therefore, we reverse the $25,000 award to Ashanti for Lejeune damages.
Vital and Scottsdale argue that the other Lejeune awards were excessive. The record supports the awards to Ms. Declouet, Lashaster and Rochshell.
The evidence shows that Catrina was a central figure in the lives of her mother and sisters. The family was close and loving. Catrina was relatively sophisticated and ambitious, and her sisters looked up to her and were influenced by her standards. Catrina was previously hospitalized with acute, nearly fatal episodes of asthma. Her family knew how serious her condition was. Their knowledge of her condition certainly worsened their distress.
Lashaster's understanding of the gravity of Catrina's condition was evidenced by her request to call 9-1-1 as soon as the girls left the auditorium, her continued pleas for emergency assistance, and her determination to defy authority and call 9-1-1. Lashaster saw Catrina gasping for breath, bent over in an attempt to get more oxygen. Lashaster heard Catrina say she was not going to make it and saw Catrina before and after she lost consciousness. Dr. Shwery testified that Lashaster suffered depression and was at times dysfunctional after the incident. Though he said Lashaster's coping skills were poor, the record supports the $75,000 award to Lashaster.
Ms. Declouet witnessed her unconscious daughter with the knowledge that previous asthma attacks had almost taken Catrina's life. She rode in the ambulance with Catrina. Dr. Shwery testified that Ms. Declouet was devastated, withdrawn from social settings, and suffered clinical "traumatic chronic" depression as distinguished from normal grief at the loss of a loved one. The evidence supports the $50,000 award to Ms. Declouet.
Though Rochshell only saw Catrina for a brief time, Dr. Shwery testified that she had an "undercurrent of depression" and had trouble functioning as mother of her young child for about six months after Catrina's death. The $25,000 award for Rochshell is high but is within the trial court's vast discretion.

Medical Expenses
Vital and Scottsdale argue that plaintiffs are not entitled to a separate award for their medical expenses after Catrina's death. That assignment has merit.
The trial court awarded $63,228.36 for past medical expenses and $80,000 for future medical expenses for psychological treatment of plaintiffs after Catrina's death. The court did not specify whether those damages were *81 awarded as an element of the wrongful death claim or as Lejeune damages.
Ms. Declouet had a wrongful death action against the defendants. La. C.C. art. 2315.2(A)(2). Lashaster, Rochshell and Ashanti did not have a wrongful death action. La. C.C. art. 2315.2(A)(3).
Two cases decided under prior La. C.C. art. 2315 (the source of Art. 2315.2) held that special damages for medical expenses occasioned by the grief and anguish of a survivor in a wrongful death action were not compensable as a separate item of damages. Meyers v. Smith, 482 So.2d 60, 63 (La.App. 5th Cir.1986); Lang v. Prince, 447 So.2d 1112, 1119-1120 (La.App. 1st Cir.), writs den. 450 So.2d 1309 (La.1984). Lang determined that the general damage award reflected the trial court's consideration of the plaintiff's extraordinary suffering and the court reversed the separate award for plaintiff's own medical expenses and lost wages.
Meyers and Lang pre-dated Lejeune v. Rayne Branch Hospital, 556 So.2d at 570 and La. C.C. art. 2315.6, which allow damages for mental distress caused by witnessing injury to a third person. The parties cite no case which has awarded separate special damages for psychological treatment based on Lejeune. We conclude based on the history and analysis of Lejeune that special damages are not recoverable.
Historically, damage for mental anguish and distress sustained by a person not directly injured and based on injury to a third person was not recoverable. Black v. Carrollton Railroad Co., 10 La. Ann. 33 (1855). Black was overruled by Lejeune, 556 So.2d at 569.
Lejeune determined under a duty-risk analysis that a duty exists to protect a plaintiff from mental anguish occasioned by the negligent infliction of injury to a third person. In Lejeune the hospital owed a duty to Mrs. Lejeune not to cause her mental anguish by allowing a rat to bite her husband. However, the Court held that policy reasons required restrictions on the type of claims that may be redressed.
The mere fact that a duty exists does not mean that it extends to everyone against every risk all of the time.... A defendant cannot be expected to be liable to virtually everyone who may suffer in any manner from his negligent conduct. The law must place some reasonable limit to liability by ascertaining or defining the scope of the duty owed by the defendant.

* * * * * *
Just as many other states have done, we find need to move restrictively in this area. It is for this reason that we are not inclined to rely simply on general principles of duty and negligence. Administrative boundaries or guidelines imposed jurisprudentially at the outset will facilitate application by the lower courts, ensure that there is no open-ended exposure of tortfeasors, and ensure as well that a policy of limited exposure to serious mental pain and anguish damages sustained by a limited class of claimants will be permitted. [Emphasis added.]
Lejeune, 556 So.2d at 569.
The Court acknowledged the contrary view that imposition of jurisprudential guidelines limiting recoverable claims circumvents general principles of duty and negligence. Id. at 569 n. 10. The Court nonetheless established guidelines concerning whether the plaintiff must view the injury-causing event, the type of injury that must be suffered by the victim, the severity of the plaintiff's mental anguish, and the character of the relationship between the plaintiff and victim. Id. at 570.
When we examine plaintiffs' claims under duty-risk and the Lejeune policy, we conclude that defendants' duty to plaintiffs did not encompass the risk that plaintiffs would require and incur expenses for medical treatment due to viewing Catrina's trauma. Although such expenses might be foreseeable under circumstances where the plaintiff's mental pain is severe, foreseeability alone is not determinative. Id. at 569. Lejeune damages are only recoverable when the plaintiff's mental anguish is "severe and debilitating." Therefore, it is foreseeable that a Lejeune plaintiff will also incur expenses for psychological treatment and other damages such as lost wages and loss of earning capacity *82 due to crippling mental suffering. The same policy reasons which circumscribed the duty in Lejeune, including ensuring against open-ended exposure for a tortfeasor, continue to dictate that reasonable limits of liability be imposed. Extension of Lejeune to special damages occasioned by the plaintiffs' mental anguish would circumvent the policy upon which the Supreme Court relied to demarcate boundaries for recovery for mental distress caused by negligent injury to a third person.
Therefore, we hold that a special award for expenses for plaintiffs' medical treatment after Catrina's death is not recoverable. We reverse and vacate the awards for past and future medical expenses which total $143,228.36.

Insurance Coverage and Indemnification of Scottsdale Insurance Company
The trial court rendered judgment for Vital against Scottsdale for the full amount of the judgment against Vital. The court denied the cross claim by Vital and Scottsdale for indemnity against the School Board. Scottsdale argues its policy did not provide primary coverage to Vital; rather, the School Board's self-insurance did. Vital and Scottsdale argue that Vital has the right to indemnity against the School Board and Scottsdale is subrogated to that right to the amount of its payment.
The Scottsdale policy did not require minimum underlying coverage but it contained an "Other Insurance" clause:

If at the time of loss there is other insurance available to the Insured covering such loss or which would have covered such loss except for the existence of this insurance, then the Company shall not be liable for any amount other than the excess over any other collectible insurance applicable to such loss.... "Other insurance available" in the first sentence of this paragraph is inclusive of any defense or indemnity benefit or any program or programs of self-insurance, whether primary or excess, available to the insured. [Emphasis added]
Vital and Scottsdale argue that the School Board's self-insurance was "other insurance" available to Vital because Vital was an Insured under the policy, the Board was obligated to defend and indemnify Vital, and the Board's self-insurance was collectible "at the time of loss."
The "Named Insured" under the Scottsdale policy is Louisiana Association of School Executives. The Definitions section defines "Insured" as
a person who is a member or an associate member of the named insured and has elected to be covered under this policy....
Vital was a member of the Louisiana Association of School Executives and he elected coverage under the Scottsdale policy. Therefore, Vital was an Insured and the Other Insurance clause applied to him.
No liability policy insuring the School Board was introduced into evidence. In Answers to Interrogatories and Response to Request for Admissions, the School Board stated that it was self-insured for general liability on the date of Catrina's death. The Scottsdale policy specifies that self-insurance constitutes "other insurance." We must then examine whether that self-insurance was "available to" Vital.
There is no documentary evidence of the Board's self-insurance program. The trial court relied upon the testimony of James Henderson, Jr., the Chief Financial Officer for the School Board, concerning whether the Board's self-insurance covered teachers and administrators. Henderson testified that the 1991 self-insurance fund did not cover individual liability of a teacher, principal, or administrator, though it covered the School Board's vicarious liability based on an employee's action. On cross-examination Henderson said the Board (through the self-insurance fund) would pay a judgment against a teacher and the Board. He did not provide the basis for that statement.
Considering the record, the absence of documentary evidence of self-insurance, and Henderson's testimony, the trial court's finding that the School Board's self-insurance did not cover Vital individually was not manifestly erroneous.
*83 Under the Scottsdale policy "other insurance available" to Vital included "any defense or indemnity benefit" available to him. Louisiana's statutory scheme imposed upon the School Board the obligation to defend and indemnify a public school principal or administrator in a suit based on an act or omission "in the directing of or disciplining of school children...." La. R.S. 17:416.1(C) provides:
Should any teacher, principal, or administrator in the public school system be sued for damages by any student ... based upon the act or omission of such teacher, principal, or administrator in the directing of and disciplining of school children under their care and supervision, it shall be the responsibility of the school board employing such teacher, principal, or administrator to provide such defendant with a legal defense to such suit.... Should any such teacher, principal, or administrator be cast in judgment for damages in such suit, it shall be the obligation of the school board employing such defendant to indemnify him fully against such judgment including all principal, interest, and costs....
Scottsdale and Vital submit that § 416.1 applies because this suit arises from the "directing of the medical emergency policy for students. However, La. R.S. 17:416.1 is entitled "Discipline of pupils; additional disciplinary authority." The history of that statute convinces us that it does not apply to the claims against Vital.
Prior to the enactment of R.S. 17:416.1 by Acts 1975, No. 559 § 1, there was no Louisiana statute establishing the right to use reasonable corporal punishment (although jurisprudence authorized it). See White v. Richardson, 378 So.2d 162 (La.App. 1st Cir. 1979); Roy v. Continental Insurance Co., 313 So.2d 349 (La.App. 3d Cir.), writ den. 318 So.2d 47 (La.1975). The purpose of the statute stated in Act 559 was
to provide that teachers and school authorities may employ reasonable disciplinary and corrective measures to maintain order in schools ...; to require the school board employing such teacher, principal or administrator to provide a defense to suits against such persons and indemnify such persons against any judgments rendered therein.
The enactment of R.S. 17:416.1 showed clear legislative intent to leave available to teachers and school officials the option of corporal punishment. Thompson v. Iberville Parish School Board, 372 So.2d 642, 644 (La.App. 1st Cir.), writ den. 374 So.2d 650 (La.1979).
Although Paragraph (C) references suits arising from "the directing of school children, all reported cases under § 416.1 involved discipline. See Edwards v. Saul, 93-1802 (La.App. 4 Cir. 5/26/94), 637 So.2d 1258, writ den. 94-1729 (La.10/14/94), 643 So.2d 161; Haley v. McManus, 593 So.2d 1339 (La.App. 1st Cir.1991); Harrell v. Daniels, 499 So.2d 482 (La.App. 2d Cir.1986), writ den. 501 So.2d 214 (La.1987); Guillory v. Ortego, 449 So.2d 182 (La.App. 3d Cir.1984).
Recent legislative action supports our limited application of La. R.S. 17:416.1. Suit by a student against a teacher based on "any action or statement or the omission of any action or statement" of the teacher in the course and scope of his duties is governed by La. R.S. 17:416.4. The legislature amended that statute by Acts 1997, No. 619, § 1 to expand its application to suits against all public school employees. If "directing of students under § 416.1(C) were as broad as Scottsdale submits, there would be little need to expand § 416.4. That suggests that La. R.S. 416.1 was limited in scope and did not apply to a suit based on a principal's act or omission in directing medical emergency procedure.
Considering statutory history, legislative intent, and jurisprudence, we conclude that La. R.S. 17:416.1 did not require the School Board to defend and indemnify Vital.
Accordingly, we affirm the trial court's judgment in favor of Vital in his third party demand against Scottsdale and in favor of the School Board on the cross claims of Vital and Scottsdale.

IINA's Right to Indemnity
The trial court held that the IINA policy provided primary coverage for Freeman. The court rendered judgment in favor of Freeman against IINA for the full amount *84 of the judgment against Freeman and in favor of Freeman on his third party demand for indemnity against the School Board. The court denied IINA's cross claim for indemnity against the School Board. IINA argues that it is subrogated to Freeman's rights of indemnity against the School Board to the extent of IINA's payment.
Freeman's right to indemnity from the School Board is governed by La. R.S. 17:416.4, which prior to its amendment by Acts 1997, No. 619, § 1 provided:
(A) ... (S)hould any teacher in the public school system be sued for damages by any student or any person qualified to bring suit on behalf of any student based on any action or statement or the omission of any action or statement by such teacher when in the proper course and scope of his duties as defined by the school board employing such teacher, then it shall be the obligation of said school board to indemnify such teacher against all reasonable costs personally incurred by the teacher in his own defense and the amount of any damages for which the teacher is cast in judgment;...
The School Board submits that Freeman's right to indemnity did not accrue or was extinguished because IINA satisfied the judgment and Freeman did not incur loss. Section 416.4 requires the School Board to indemnify Freeman against "any damages for which the teacher is cast in judgment." That obligation is not limited to the amount the teacher personally incurs and is independent of payment by the teacher's private insurance carrier.
In Haley v. McManus, supra, the trial court held the teacher liable under La. R.S. 17:416.1 for whipping a student with a belt and denied the teacher indemnity from the School Board. The appellate court reversed the indemnity holding because the School Board's obligation to indemnify the teacher "fully against such judgment" was mandatory and "not conditioned upon the absence of personal malpractice coverage." Haley, 593 So.2d at 1346. Freeman's case arising under § 416.4 is analogous. Freeman is entitled to indemnity from the School Board.
IINA argues its insurance policy establishes a right of conventional subrogation. Subrogation is the substitution of one person to the rights of another and it may be conventional or legal. La. C.C. art. 1825. An obligee who receives performance from a third person may subrogate that person to the rights of the obligee, and that subrogation is subject to the rules governing the assignment of rights. La. C.C. art. 1827.
Section IV, paragraph 8 of the IINA policy reads:
8. Transfer of Rights of Recovery Against Others To Us.
If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.
That provision clearly establishes IINA's subrogation to Freeman's right to indemnity against the School Board for any IINA payment. See Losavio v. Kansas City Southern Railway Company, Inc., 95-2795, p. 6 (La.App. 4 Cir. 5/29/96), 675 So.2d 821, 824, writ den. 96-1691 (La.10/4/96), 679 So.2d 1388.
The School Board argues that Freeman's right to indemnity is strictly personal and cannot be subrogated. That argument has no merit.
An obligation is heritable (transferable) when its performance may be enforced by a successor of the obligee or against the successor of the obligor. La. C.C. art. 1765. Every obligation is deemed heritable as to all parties except when the contrary results from the terms or nature of the contract. Id. All rights may be assigned except those pertaining to obligations that are strictly personal. La. C.C. art. 2642. The assignee is subrogated to the rights of the assignor against the debtor. Id. An obligation is strictly personal when its performance can be enforced only by the obligee or only against the obligor. La. C.C. art. 1766. It is presumed strictly personal on the part of the obligor when performance requires the special *85 skill or qualification of the obligor or the obligation is one to perform personal services. Id.
The statute obligating the School Board to indemnify Freeman does not stipulate that it is strictly personal and not transferable. There is no basis not to enforce the subrogation clause in IINA's policy. Therefore, we reverse the denial of IINA's claim for indemnity against the School Board and render judgment in favor of IINA.

Conclusion
We affirm the judgment finding Vital liable. The apportionment of fault was manifestly erroneous to the extent that it assigned greater fault to Vital than to Freeman. We amend the judgment to apportion 30% fault to Vital, 50% to Freeman, and we affirm the allocation of 20% fault to the School Board.
The award for survival damages was excessive and we amend that award to $250,000. We affirm the award to Ms. Declouet, Rochshell Lewis, and Lashaster Lewis for mental pain and anguish. Lejeune v. Rayne Branch Hospital, supra. We vacate the award to Ashanti Declouet for mental pain and anguish and vacate the awards to Ms. Declouet, Rochshell Lewis, Lashaster Lewis, and Ashanti Declouet for past and future medical expenses.
We affirm the judgment in favor of Vital and against Scottsdale for the full amount of the judgment against Vital, and affirm the denial of the cross claim by Vital and Scottsdale for indemnity against the School Board.
We affirm the judgment in favor of Freeman on his third party demand for indemnity against the School Board, reverse the judgment denying IINA's cross claim for indemnity against the School Board, and render judgment in favor of IINA for indemnity against the School Board.
AFFIRMED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED; REVERSED IN PART; RENDERED.
NOTES
[1] Other defendants were not held liable and are not a party to this appeal.
[2] Vital was the assistant principal in charge because the principal was not on campus.
[3] Baptiste's testimony is missing from the record. The parties stipulated that the trial court's reasons for judgment accurately reflect that testimony.
[4] The counselor's job was to maintain the student's records, advise and counsel students.
[5] The record also contains an Answer by Jupiter on behalf of Vital and the School Board to plaintiffs' Third Supplemental and Amending Petition. That answer was inexplicably filed November 16, 1994 before plaintiffs' third supplemental petition was filed.
[6] The trial court's reasons state that the School Board was 20% liable for failing to train its employees and under the theory of respondeat superior.
[7] La. C.C. art. 2315.6 now enumerates persons entitled to recovery.